Argued and submitted July 27, 1984, affirmed February 27, reconsideration denied April 19, petition for review denied June 4, 1985 (299 Or 251)

## STATE OF OREGON,
*Respondent,*

*v.*

## RANDY LEE SNYDER,
*Appellant.*

(34083; CA A29049)

695 P2d 958

David E. Groom, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were David B. Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Richardson, Presiding Judge, and Warden and Newman, Judges.

WARDEN, J.

**WARDEN, J.**

Defendant appeals his conviction for burglary in the second degree. ORS 164.215. After the trial court had denied his motion to suppress evidence taken as a result of his being stopped by police officers, he waived his right to a jury trial and was tried by the court. His conviction stemmed from a February 23, 1983, break-in at a gas station in Redmond, in which 140 to 160 packages of cigarettes were stolen. We affirm.

Grant County Deputy Sheriff Woodruff encountered defendant at about noon on February 25, 1983. Woodruff was driving west to Dayville to investigate a burglary at the Dayville High School that had occurred during the previous night. Defendant was traveling east on foot about a mile east of Dayville. Woodruff knew most of the people who lived in and around Dayville but did not recognize defendant.

Woodruff stopped and asked defendant, among other questions, whether he had been in Dayville. Defendant responded that he had been there overnight. Woodruff then asked for his name and identification. He said his name was Lauren Anthony McDowdy but could not produce identification. He said that he was from Florida and gave from memory a five-digit Florida driver's license number. Woodruff was suspicious, because he remembered Florida's driver's license numbers as having 12 digits, but he proceeded to Dayville.

The trial court found that in this encounter with Woodruff

"defendant was not required to alter his course, but proceeded in the same direction he had been headed, voluntarily walked up to the officer, carefully checking his pack for identification. The officer testified that the defendant was free to leave here. The testimony is uncontroverted by the defendant. The questioning appeared to be friendly, courteous. The officer told the defendant he would give him a ride if the defendant was still staying in the area. There was no show of physical force or authority which would restrain the defendant's liberty."

Because of his suspicions, Woodruff radioed his office in John Day, stating the name defendant had given him, describing defendant, including the fact that he had an artificial arm, and requesting verification of the Florida

driver's license number. Walker, a police officer for the city of John Day, monitored Woodruff's radio message.

Two hours later Walker encountered defendant in John Day. Walker knew of the Dayville burglary, that defendant was a transient who had been in Dayville when the burglary had occurred and had given Woodruff a fictitious Florida driver's license number. He stopped defendant and asked him his name. Defendant said his name was Lauren Andrew Dowdy (not quite the name he had given Woodruff). Defendant denied having had contact with Woodruff earlier that afternoon. Walker decided to take defendant to the police station "to find out who the defendant was." He patted defendant down and found, among other things, a pipe with marijuana residue in the bowl. He then took defendant to the police station.

The trial court made findings with respect to this second encounter:

> "First, the defendant was searched for any weapons for the officer's protection and safety. * * * Secondly, he was not handcuffed or placed under arrest. Thirdly, I rule that the circumstances did not result in the defendant voluntarily going down to the police station. There were two police cars in the vicinity, the officers were in uniform. The request by the officer was they go down to the police station to find out who the defendant was. That gave rise to an inference that a reasonable person would not believe that he was entitled to refuse that request. In other words, I hold that the taking of a defendant down to the police station under these circumstances was involuntary despite his comment to the officer, 'That sounds like fun.'"

At the station Walker advised defendant of his *Miranda* rights and questioned him about who he was and where he was going.[1] Defendant admitted that his true name was Randy Snyder and volunteered that there might be a

---

[1] The testimony at trial was unclear as to whether Walker gave defendant *Miranda* warnings before questioning him. We assume from defendant's failure to argue the point and from the trial court's oral ruling on defendant's motion to suppress that Walker gave the *Miranda* warnings before questioning:

> "They arrived at the police station, the defendant was given his Miranda Rights. He was interviewed about who he was and where he was going. Eventually defendant gave his true name and there was a warrant out for him out of Deschutes County."

warrant for his arrest in Deschutes County. Walker ran defendant's name through the computer system and confirmed that there was a Deschutes County warrant for his arrest for second-degree criminal trespass and driving while suspended. He then informed defendant that he was under arrest. Defendant signed a card granting permission for a search of his person and property.

Walker took defendant to the Grant County Sheriff's Office in Canyon City to be booked and lodged in jail. There Walker and another officer searched defendant's personal effects and found a brown box bearing the address of the hospital in Redmond. Inside the box were 33 packages of cigarettes. Walker again advised defendant of his *Miranda* rights and obtained defendant's confession to the burglary of the Redmond gas station. Defendant also confessed to stealing some meat and cheese from a church in Independence. The next day, defendant repeated the confessions to Walker and an officer from Redmond. He never confessed to the burglary of the Dayville High School.

Defendant argues that his initial encounters with both Woodruff and Walker were stops within the meaning of ORS 131.615(1) and *Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968), and that neither officer had reasonable suspicion sufficient to justify a stop. ORS 131.615(1). He also argues that Walker violated ORS 131.615(2) and the rule announced in *Dunaway v. New York,* 442 US 200, 99 S Ct 2248, 60 L Ed 2d 824 (1979), by removing him to the police station. Defendant contends that the cigarettes and his confessions were "fruit of the poisonous tree" and that the trial court erred in denying his motion to suppress them.

The trial court based its denial of the motion to suppress on the following rulings: that the encounter with Woodruff was not a stop; that the encounter with Walker was a stop but was justified by reasonable suspicion; that the removal of defendant to the police station was proper under *State v. Tucker,* 286 Or 485, 595 P2d 1364 (1979), because it was not for the purpose of custodial interrogation related to the crime with which defendant was charged and was thus a "reasonable inquiry" rather than a custodial arrest; and that discovery of the Deschutes County arrest warrant purged the evidence of taint from prior illegality, if any.

We agree with the last of these rulings and therefore need not consider the others. Under *State v. Dempster,* 248 Or 404, 434 P2d 746 (1967), Walker's discovery of the arrest warrant and his arrest of defendant under the warrant's authority purged the evidence from the taint of prior illegality. The Supreme Court in *Dempster* assumed that the police may have unlawfully taken the defendant to the police station. While the defendant was there, an officer discovered a bench warrant for his arrest. The officer then conducted a search incident to the arrest and found narcotics and related paraphernalia on the defendant's person. The court held that the intervening discovery of the bench warrant dissipated the taint of the illegal detention because "when the sergeant found the warrant he was bound to obey its command and arrest defendant." 248 Or at 407.

Defendant attempts to distinguish *Dempster* with three arguments. He first points out that "the officers did not know who defendant was in the present case." We take that to suggest that, because the police knew Dempster's identity, they could have discovered the bench warrant and arrested him without the illegal detention. This argument relates only to the question whether the causal relation between Dempster's illegal detention and the search incident to his arrest on the bench warrant were close enough for a taint to have arisen in the first place. We must reject it, because the opinion in *Dempster* declares it irrelevant that prior illegality may have tainted the search; even if there was a taint, it was purged by the intervening discovery of the bench warrant.

Second, defendant argues that, unlike the defendant in *Dempster,* he "was not on probation, so that status could not be used by the officer here to justify closer scrutiny into defendant's activities." However, the decision in *Dempster* does not suggest that the defendant's probation status lent any justification to his detention, nor does it suggest that the extent to which his detention was justified or unjustified affected the legality of what the police did after they discovered the bench warrant.

Third, defendant argues that

"Walker learned defendant's identity and about the existence of a warrant out for defendant from defendant's own mouth, not from a records check as in *Dempster. Dunaway,*

which was decided twelve years after *Dempster,* specifically proscribes use of words from a defendant's own mouth when he has been seized upon less than probable cause."

Defendant's analysis is incorrect. Although *Dunaway v. New York, supra,* proscribes the use of evidence obtained in a custodial interrogation on less than probable cause, it leaves open the possibility that subsequent events might attenuate the connection between an illegal detention and evidence obtained during the interrogation. The opinion does not accord any special status to "words from a defendant's own mouth." Indeed, it suggests that the proper administration of *Miranda* warnings may cure any Fifth Amendment problems in the use of such evidence, although it expressly holds that *Miranda* warnings alone do not cure a violation of the Fourth Amendment. In *Dempster* the court did not rely on the administration of *Miranda* warnings to justify the admission of evidence obtained after the arrest on the bench warrant; neither do we here.

Affirmed.