Submitted on record and briefs June 27, 2006, reversed and remanded for new trial
February 21, 2007

## STATE OF OREGON,
*Respondent,*

*v.*

## LEONARD ROBERT BENTZ,
*Appellant.*

030934913; A124628

158 P3d 1081

James N. Varner filed the brief for appellant.

Susan G. Howe, Senior Assistant Attorney General, filed the brief for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum,* Judges.

ROSENBLUM, J.

---

* Rosenblum, J., *vice* Richardson, S. J.

**ROSENBLUM, J.**

A police officer entered a private residence without a warrant. After defendant told the officer that there was an outstanding warrant for defendant's arrest, the officer arrested him. Before verifying that a warrant actually existed, the officer conducted an inventory search of defendant's person, which resulted in the discovery of methamphetamine in his pocket. The trial court denied defendant's motion to suppress evidence of the methamphetamine, and a jury convicted defendant of possession of a controlled substance. *Former* ORS 475.992(4)(b) (2001).[1] Defendant appeals, assigning error to the denial of his motion to suppress. On review for errors of law, we reverse and remand.

The following facts are undisputed. Portland Police Officer Slyter received a call stating that, moments earlier, someone had observed a man putting a gun into his waistband and entering an apartment. Slyter was given a description of the man and the address of the apartment. When he arrived at the scene, Slyter peeked around the corner of a building across the street. The front door of the apartment was open. Slyter saw three or four people sitting or standing just inside the door, one of whom matched the description given by the caller. Slyter and another officer, both of whom were in uniform, began walking toward the front door of the apartment with their guns drawn. As they approached, one of the people—defendant's brother, Rubin, to whom that apartment was rented—saw the officers, stood up with a scared expression on his face, and ran into the apartment. Slyter yelled at him to stop, but he did not.

At that point, the man who matched the description given by the caller—Ward—spun around and faced Slyter. Slyter "took him down" at gunpoint, and the other officer patted him down and found a pistol in a holster on Ward's right side. They also found methamphetamine on his person.

As Slyter later testified, as part of his police training, he had been taught that, if he found one gun, he should

---

[1] *Former* ORS 475.992 was amended and renumbered as ORS 475.840 in 2005. The amendment is not material to this case.

assume that there is a second one. Based on that training and the fact that Rubin had run into the apartment, he believed that Rubin could be hiding a gun in the apartment. Slyter yelled into the apartment for "somebody to come out of the apartment." After about five minutes of continued yelling, Rubin and a woman, Lohr, came out of the apartment. By then, three or four additional police officers had arrived on the scene. The officers patted Rubin and Lohr down to check for weapons, but did not place them under arrest. No weapons were found. Slyter asked them if there was anyone else in the apartment, and they both said no. After a pause, Lohr then indicated that her two small children were in the apartment. Slyter, Rubin, and Lohr talked for several minutes before Lohr asked if she could get the children. Slyter said that she could. When she turned and went into the apartment, he followed her in.

Slyter found defendant and another woman sitting in the living room. They remained seated when he walked in. Slyter asked for their names. Defendant gave a false name. Slyter said that he believed that defendant was lying. He told defendant that he was "probably" going to arrest him anyway so he "may as well tell me the truth and not make it any worse." Slyter did not, in fact, have any reason to arrest defendant. He later testified that, if defendant had said nothing further, he would not have arrested him.

Defendant responded by telling Slyter his real name and that there was an outstanding warrant for his arrest. Slyter believed that defendant was telling the truth and decided to arrest him based on his statement about the warrant. Because the officers had not yet determined that there were no other weapons in the apartment, and because a records check can take several minutes, Slyter decided to handcuff defendant and put him in the back of his squad car before verifying the existence of the warrant. Portland City Code section 14C.10.040 requires Portland Police Officers to conduct an inventory search of a person before transporting the person in a police vehicle, so, before putting defendant in the car, Slyter patted him down and searched his pockets. In one of defendant's pockets, Slyter found a small bag containing methamphetamine. After defendant was in custody, Slyter verified that there was, in fact, an outstanding warrant for defendant's arrest.

Defendant was charged with possession of a controlled substance. Before trial, he moved to suppress the evidence obtained in the search, arguing that Slyter's entry into the apartment was unlawful, that his questioning of defendant effected an unlawful stop, and that the evidence discovered in the search was the product of exploitation of Slyter's unlawful acts. At the hearing on defendant's motion, Slyter testified about the events described above. Slyter also testified that, before defendant told him about the warrant, he had no reason to arrest defendant; on cross-examination, he stated candidly that, when he told defendant that he was probably going to arrest him, he was lying to try to get defendant to tell him his real name. Slyter also explained that, had he not discovered the methamphetamine, he would not have taken defendant to the police station based solely on defendant's representation that there was a warrant for his arrest. He stated, "I may have put him in my car until I verified if there was a warrant, but we would not have gone to East Precinct or downtown without me knowing that he, indeed, had a warrant."

The trial court concluded that Slyter's entry into the apartment was unlawful, but it nevertheless denied defendant's motion to suppress. The court concluded that exploitation does not occur when the police seek a person's name, as opposed to the person's consent to search. According to the court, "[r]evealing your name is not the waiver of a right," so Slyter did not exploit his illegal entry by questioning defendant.

The methamphetamine found in the search was introduced into evidence at trial, and a jury found defendant guilty. This appeal followed.

■ Defendant argues that the trial court should have suppressed the challenged evidence because it was discovered during an unlawful stop. The state does not argue that the trial court's analysis was correct; it instead offers several alternative bases for affirming the court's ruling. We read the state's brief as implicitly conceding that the trial court's reasoning was erroneous. Before considering the state's alternative arguments, we address the trial court's reasoning.

■■ As noted, the court concluded that merely asking a person's name does not constitute exploitation. With respect,

we disagree. Exploitation occurs when there is a causal connection between police illegality and the subsequent discovery of evidence. *State v. Hall*, 339 Or 7, 31, 115 P3d 908 (2005). Thus, asking a person's name constitutes exploitation if the question causes the person to give information that leads the police to evidence. Here, asking defendant his name constituted exploitation of the illegal entry if the question caused defendant to admit the warrant's existence. *Compare id.* at 36 (officer's request for consent to search constituted exploitation because it caused the defendant to consent) *with State v. Rodriguez*, 317 Or 27, 41, 854 P2d 399 (1993) (because the defendant volunteered his consent to search with no police prompting, there was no exploitation).

The state does not argue that Slyter's questioning did not cause defendant to tell him about the warrant.[2] Thus, we do not consider that issue. Instead, as noted, the state offers several alternative bases for affirming the trial court's denial of the motion to suppress. The state argues that Slyter's contact with defendant was a lawful stop under the circumstances because, it contends, Slyter's entry into the apartment was lawful under the emergency aid and protective sweep doctrines and Slyter had reasonable grounds to stop defendant. It also argues that, even if the contact with defendant was unlawful, the discovery of the outstanding arrest warrant purged the evidence of any taint of the illegality.

■ Under the "right for the wrong reason" doctrine, we will affirm a trial court ruling, even if the court's legal reasoning for the ruling was erroneous, if (1) the facts of the record are sufficient to support the proffered alternative basis; (2) the trial court's ruling is consistent with the view of the evidence under the alternative basis; and (3) the record is materially the same as would have been developed had the prevailing party raised the alternative basis for affirmance below. *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001). "[A] trial court will not be 'gratuitously reversed,' and if the trial court's result is,

---

[2] The state concedes that Slyter effected a stop when he told defendant that he was probably going to arrest him anyway and that, "[a]s a result of the stop, defendant told Slyter that he had an outstanding arrest warrant, which led to defendant's arrest and subsequent inventory of his person, where the drugs were discovered."

ultimately, correct, it will be affirmed on alternative grounds to avoid an unnecessary remand." *Frady v. Morrow*, 169 Or App 250, 254, 9 P3d 141 (2000).

■ ■ The state's argument that Slyter's contact with defendant constituted a lawful stop hinges in part on its assertion that Slyter's entry into the apartment was justified under the emergency aid doctrine and the protective sweep doctrine, so we first consider whether the entry into the apartment was lawful. We address the state's arguments under the emergency aid doctrine and the protective sweep doctrine together, because, given the facts of this case, our analyses under both doctrines turn on similar grounds. Under the emergency aid doctrine, a warrantless entry into a residence is lawful if (1) the police have reasonable grounds to believe that there is an immediate need for their assistance for the protection of life; (2) there is a "true emergency"—that is, the circumstances giving rise to the police's belief that action is necessary actually exist; (3) the search is not primarily motivated by an intent to arrest a person or seize evidence; and (4) the police reasonably believe that, by making the warrantless entry, they will discover something that will alleviate the emergency. *State v. Follett*, 115 Or App 672, 680, 840 P2d 1298 (1992), *rev den*, 317 Or 163 (1993). For a true emergency to exist, there must be an identifiable potential victim of a life-threatening incident, an identifiable potential perpetrator of a dangerous act, or both. *State v. Burdick*, 209 Or App 575, 581, 149 P3d 190 (2006).

■ Under the protective sweep doctrine, a protective sweep beyond the immediate area of an arrestee is permissible where necessary to ensure officer safety if specific and articulable facts indicate that there could be persons present posing an immediate threat of danger to the officers or others. *State v. Cocke*, 161 Or App 179, 193, 984 P2d 321 (1999), *rev'd on other grounds*, 334 Or 1, 45 P3d 109 (2002). In *Cocke*, the Supreme Court declined to hold "that it is *per se* unreasonable, under Article I, section 9, [of the Oregon Constitution] for the police to search the nearby private residence of someone other than an arrestee to ensure officer safety, or that police must have probable cause in every case in which they do so." 334 Or at 9. Rather, it instructed that, "for purposes of officer safety searches incident to arrest, courts look to the totality of the circumstances to determine whether the

precautions taken by the officers were reasonable at the time that the decision to search was made." *Id.* at 9-10. The court cautioned that an intrusion into a residence is not justified where the police "could articulate only a generalized concern * * *." *Id.* at 10.

In this case, the totality of the circumstances when Slyter entered the apartment were as follows: The police had received a report about a person with a gun at Rubin's apartment. The person matching the description in the report was in custody and his gun had been secured. When the officers initially approached the apartment, Rubin looked distressed at their approach, ran into the apartment, and stayed in the apartment for approximately five minutes despite the officers' orders to stop and to come out. Rubin and Lohr eventually did come out. At that point, everyone whom the officers had seen in the doorway of the apartment when they approached was outside and had been frisked. Rubin and Lohr indicated that there was no one else in the apartment, but Lohr then stated that her two children, ages five and two, were inside.[3] Lohr then asked if she could go inside and get the children.

Slyter testified that he had not received "any additional information about additional weapons or additional suspects at that time." He stated his concerns about there being a gun in the apartment as follows:

"In our training, we're always taught to—if you find one, assume that there's a second gun. So my assumption was there could possibly be a second one. At the time when [defendant's brother] took off running, I was unaware if the person that matched the description [in the report], indeed, had a weapon or had given the weapon to somebody else.

"So when he ran into the apartment and completely out of my sight, not listening to my commands, my belief or

[3] The state notes that Slyter observed "three to four" people at the apartment entry when he first approached, and it asserts that, given that Ward was the only person taken into custody outside the apartment, Slyter had reason to believe that defendant's brother and Lohr were not being truthful when they indicated that no one else was inside the apartment. The state's conclusion is incorrect. Slyter testified that there were "three people outside prior to [defendant's brother] and Ms. Lohr coming out." Furthermore, he did not testify that anyone but defendant's brother had gone into the apartment.

assumption was that he could easily be hiding a gun. Because of the close proximity that we ended up being to the front door, there was I believe it was a bedroom window that immediately looked out over the top of us as well as the open front door * * *."

Thus, Slyter was concerned that an armed person inside the apartment would have had a clear shot at the officers.

Viewing the totality of the circumstances, we conclude that Slyter did not have reasonable grounds to believe that there was a true emergency that required immediate action or that there were persons present who posed an immediate threat of danger to the officers or anyone else. No specific articulable facts indicated that anyone other than Lohr's children was inside the apartment. Furthermore, once Ward's gun had been secured, Slyter had no reason to believe that Ward had given the gun to defendant's brother. Thus, the only thing supporting Slyter's concern that there could be another gun in the apartment was his training, which taught him to assume that, when one gun is found, another is present. Although that might be a prudent assumption for a police officer to make, where no articulable facts support the assumption, it is not a sufficient basis for a warrantless search.

In short, because there were no specific and articulable facts indicating that either a potential victim of a life-threatening incident or a potential perpetrator of a dangerous act were present in the apartment, we reject the state's contention that the emergency aid doctrine and the protective sweep doctrine justified Slyter's warrantless entry into the apartment. That conclusion also disposes of the state's argument that Slyter's contact with defendant was a lawful stop, because that argument hinges on the state's assertion that Slyter's entry into the apartment was lawful. It follows that Slyter's stop of defendant was unlawful. Because the evidence used in defendant's trial would not have been discovered without the unlawful stop, the evidence was tainted.

■■ We turn, then, to the state's argument that the discovery of the outstanding arrest warrant purged the evidence of the taint of any illegality. When a defendant establishes

the existence of a nexus between prior unlawful police conduct and evidence that the defendant seeks to have suppressed, "the state nevertheless may establish that the disputed evidence is admissible under Article I, section 9, by proving that the evidence did not derive from the preceding illegality." *Hall*, 339 Or at 25. One of the ways in which the state can prove that the evidence did not derive from the police illegality is by showing that "the preceding violation of the defendant's rights under Article I, section 9, has such a tenuous factual link to the disputed evidence that that unlawful police conduct cannot be viewed properly as the source of that evidence." *Id.*

The Supreme Court has held that the existence of an outstanding arrest warrant can serve to attenuate the link between a police illegality and evidence discovered thereafter. In *State v. Dempster*, 248 Or 404, 434 P2d 746 (1967), the defendant accompanied the police to the police station under circumstances that he later alleged amounted to an unlawful arrest without probable cause. When they were at the police station, one of the officers discovered a bench warrant for the defendant's arrest. The officer showed him the warrant, informed him that he was under arrest, and then searched him and found drugs and paraphernalia on his person. *Id.* at 405-06. The defendant moved to suppress the evidence found in the search, arguing that it was tainted by the unlawful initial detention. *Id.* at 407.

The Supreme Court assumed, without deciding, that the initial detention was unlawful, but it nevertheless held that the evidence was not subject to suppression. Noting that the defendant did not challenge the validity of the bench warrant, the court held that he was lawfully arrested at the police station and that the search was reasonable either as a search incident to arrest or as an inventory of his belongings before locking him up. *Id.* at 407. The court stated that the

"lawful arrest on the bench warrant purged the search incident thereto of the taint of any illegality in the detention of [the] defendant prior to that time. In the language used in *Nardone v. United States*, 308 US 338, 60 S Ct 266, 84 L Ed 307, 312 (1939), the connection between the alleged illegal

arrest and the subsequent search had 'become so attenu-ated' by the intervening legal arrest 'as to dissipate the taint.'"

*Id.* at 408.

In this case, as in *Dempster*, defendant does not argue that the warrant for his arrest was invalid. There is also no dispute that the warrant served as the impetus to arrest defendant and that the search was a routine inventory incident to that arrest. There is, however, a significant dis-tinction between the facts in this case and those in *Dempster*. In that case, the arresting officer had the warrant in hand when he informed the defendant that he was under arrest and searched him, whereas here, Slyter proceeded with the arrest and search merely on defendant's word that a warrant existed.

Slyter had authority to conduct a warrantless search incident to arrest only if the arrest itself was lawful. It is not clear that Slyter could lawfully arrest defendant without first verifying the existence of the warrant. The authority to arrest, with or without a warrant, is governed by statute. ORS 133.310(2) provides that an officer may arrest a person without a warrant if the officer "is notified by * * * another peace officer of any state that there exists a duly issued war-rant for the arrest of a person within the other peace officer's jurisdiction." It is not readily apparent whether that statute applies when the "duly issued warrant" was issued in Oregon. We need not decide that issue, however, because it is clear that, when a warrant for a person's arrest was issued in another state, ORS 133.310(2) provides the only circum-stance in which a police officer may arrest the person—namely, receiving notice of the warrant from a police officer in the issuing jurisdiction. Under the statute, a police officer receiving notice of an out-of-state warrant from the person named in the warrant, and not from a police officer, does not have authority to arrest the person. It follows that, if the war-rant for defendant's arrest was issued in another state, until Slyter verified the warrant's existence, he had not received the notice required by ORS 133.310(2), so defendant's arrest would not have been lawful.[4]

---

[4] We do not mean to imply that arresting a person before verifying the exis-tence of a warrant necessarily requires suppression of all evidence found after the

The record in this case does not reflect whether the arrest warrant was issued in Oregon or in another jurisdiction. Because the state advances a "right for the wrong reason" argument, we can affirm on the ground urged by the state only if the record is the same as would have been developed had the state raised the issue before the trial court. *See Outdoor Media Dimensions Inc.*, 331 Or at 659-60 (affirmance under the "right for the wrong reason" doctrine requires that "the record materially be the same one that would have been developed had the prevailing party raised the alternative basis for affirmance below"). Although the state suggested to the court that the arrest warrant purged the taint of the illegal entry, the court, without hearing argument on the issue from defendant, rejected the state's position, concluding that, without the unlawful entry, Slyter would not have discovered the warrant.[5] The state accepted the court's answer, and neither the parties nor the court pursued the issue any further. Consequently, defendant did not have an opportunity to develop a different record—specifically, one that might have shown that the warrant was issued in another state. It follows that we may not affirm the trial court's ruling on the ground that the arrest warrant purged the evidence of any taint of the illegal entry into the apartment.

In summary, the trial court's reasoning for denying defendant's motion to suppress was erroneous. None of the alternative grounds advanced by the state furnishes an adequate basis for affirmance. It follows that defendant's

---

arrest. Had Slyter arrested defendant, verified the warrant, and *then* searched defendant, we would be faced with a different issue.

[5] We note that the trial court's conclusion is inconsistent with our decision in *State v. Snyder*, 72 Or App 359, 695 P2d 958, *rev den*, 299 Or 251 (1985). In that case, the police illegally detained the defendant, who then told them his real name and that a warrant existed for his arrest. *Id.* at 362-63. The police verified the existence of the warrant, informed the defendant that he was under arrest, and then searched him. *Id.* at 363. The defendant moved to suppress the evidence found in the search, arguing that the arrest was invalid because the police learned about the warrant from the defendant himself during his illegal detention, rather than from a records check, as had happened in *Dempster*. We held that an arrest can validly be made under a warrant even though the police learned about the warrant from the defendant during an unlawful detention. *Id.* at 364-65. Thus, in this case, had Slyter verified the warrant before arresting defendant, under *Snyder*, the evidence would have been admissible in spite of his unlawful entry into the apartment. We do not here consider whether the Supreme Court's analysis in *Hall* affects the continuing vitality of *Snyder*.

conviction must be reversed and the case remanded for a new trial.

Reversed and remanded for new trial.