Argued and submitted April 26, affirmed August 14, petition for review allowed November 29, 2013 (354 Or 490)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CLARK ALLEN BAILEY,
aka Clarke Allen Bailey,
*Defendant-Appellant.*

Multnomah County Circuit Court
101033810; A148109

308 P3d 368

Jonah Morningstar, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

David B. Thompson, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Egan, Judge, and De Muniz, Senior Judge.

ARMSTRONG, P. J.

Egan, J., dissenting.

## ARMSTRONG, P. J.

Defendant appeals his conviction for delivery of cocaine, ORS 475.880, possession of cocaine, ORS 475.884, and tampering with physical evidence, ORS 162.295, and assigns error to the trial court's denial of his suppression motion. He contends that the police violated Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution by unlawfully seizing him during a traffic stop. He further contends that the trial court erred in denying his motion to suppress evidence that the police discovered when they conducted a search incident to arrest after they arrested defendant on a warrant, the existence of which they had discovered during their unlawful detention of him. We affirm.

We review the denial of a suppression motion for legal error. ORS 138.220. The trial court's findings of fact are binding on appeal if there is constitutionally sufficient evidence in the record to support them. *State v. Ehly,* 317 Or 66, 75, 854 P2d 421 (1993). If the trial court did not make express findings of fact on a pertinent issue and there is evidence from which those facts could be decided more than one way, we presume that the court found the facts in a manner consistent with its ultimate conclusion. *Id.* Applying those standards, we recite the following facts from the trial court record.

In the fall of 2010, Portland was experiencing what one police officer termed a "tremendous amount of gang violence" in the city. As part of efforts to forestall more violence, police officers set up surveillance at a funeral that was attended by several gang members. After the funeral, officers followed one of the attendees to a house in Northeast Portland, at which several gang members were seen by officers to be congregating. The officers were concerned that the gang members at the house were contemplating violence or that they would be the target of violence perpetrated by members of other gangs. The police continued to monitor the house, with both unmarked patrol cars on the ground and a Portland Police Bureau aircraft overhead. An officer in the aircraft saw four people leave the house and enter what he thought was a "Dodge Charger, Magnum-type vehicle." One

of the officers testified that those cars are often rental cars and that rental cars are often used for drive-by shootings and other crimes.

Concerned that the car's occupants were on their way to commit a crime, the officer in the aircraft followed the car as it left the house and asked a patrol unit to stop it. After the car's driver failed to signal for the legally required 100 feet before making a turn, ORS 811.375(1)(b), the police stopped the car. There were two backseat passengers in the car, one of whom was defendant. When the driver could not produce valid proof of insurance, an officer attempted to contact the driver's insurance company by phone to determine whether the driver was, in fact, insured.

Two backup officers arrived several minutes after the initiation of the stop. One of those officers, Stradley, recognized defendant to be a gang associate but could not remember his name. Various officers made repeated efforts to discern the identities of the two backseat passengers, but the passengers refused to identify themselves to the police. While the first officer on the scene was trying to contact the driver's insurance company, Stradley called Officer Burley to the scene to try to identify defendant and the other backseat passenger.

Thirty minutes after the initiation of the stop, and some time after the officers had concluded their investigation into the status of the driver's insurance, Burley arrived. Burley looked inside the vehicle and was immediately able to identify defendant by name. After Burley recognized defendant, Stradley ran defendant's name for warrants and discovered that there was an outstanding felony warrant for defendant's arrest. While in the process of arresting defendant on the warrant, Burley noticed that defendant was having trouble speaking. He asked defendant to open his mouth, where Burley saw a plastic bag containing a white substance under defendant's tongue. Subsequent testing revealed that the bag contained cocaine. The police also searched the backseat area where defendant had been sitting; that search revealed approximately $700 in cash, which the officers attributed to defendant.

Defendant moved to suppress the evidence discovered after his arrest. Among other things, the trial court concluded that the police had unlawfully seized defendant during the traffic stop but that the evidence discovered after his arrest was nonetheless admissible because the discovery of the warrant served to cure any prior illegality. The court therefore denied defendant's suppression motion. Defendant was subsequently convicted after a stipulated facts trial, and this appeal followed.

On appeal, defendant contends that the police unlawfully seized him in violation of both Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. He argues that the officers' discovery of his outstanding arrest warrant did not "attenuate" the discovery of the disputed evidence from the initial unlawful seizure and that suppression of the evidence was therefore required. In response, the state does not challenge defendant's contention that he was unlawfully seized; rather, the state argues that, under the principle announced in *State v. Dempster*, 248 Or 404, 434 P2d 746 (1967), and applied in *State v. Snyder*, 72 Or App 359, 695 P2d 958, *rev den*, 299 Or 251 (1985), and subsequent cases, an arrest on an outstanding warrant purges evidence obtained as a result of the arrest from the taint of a prior unlawful seizure, such that suppression is not required. Because the state does not challenge the trial court's conclusion that the police unlawfully seized defendant, the only issue before us is whether the discovery of the valid arrest warrant purged the taint of the prior unlawful seizure of defendant. We first address defendant's arguments under the Oregon Constitution before turning to those he makes under the United States Constitution. *See, e.g., State ex rel Juv. Dept. v. S. P.*, 346 Or 592, 606, 215 P3d 847 (2009) ("As part of the 'first things first' methodology, we * * * consider state constitutional issues before we consider federal claims.").

Oregon has long recognized that the discovery of an outstanding warrant for a defendant's arrest purges the taint of prior unlawful police conduct that might otherwise require suppression of evidence obtained as a result of an arrest on the warrant. The Oregon Supreme Court first

announced that principle in *Dempster*, 248 Or at 408. There, officers suspected that the defendant had been involved in stealing money from parking meters. An officer recognized the defendant on the street one day and either asked or demanded that he get into the officer's police car. The defendant complied and was taken to the police station. Officers ran a records check on the defendant at the station, which revealed an outstanding bench warrant. The officers arrested the defendant on the warrant and discovered drugs and drug paraphernalia during a search incident to that arrest. *Id.* at 406.

The defendant contended in the Supreme Court that he had been unlawfully detained when he got into the police car and that the subsequently obtained evidence was tainted by his unlawful seizure and should have been suppressed. The court assumed without deciding that the defendant's initial detention was an unlawful seizure but affirmed the denial of the defendant's suppression motion because the subsequent "lawful arrest on the bench warrant purged the search incident thereto of the taint of any illegality in the detention of defendant prior to that time." *Id.* at 408. In support of that conclusion, the court cited two United States Supreme Court cases, *Nardone v. United States*, 308 US 338, 60 S Ct 266, 84 L Ed 307 (1939), and *Wong Sun v. United States*, 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963).

We considered a similar factual scenario in *Snyder*. There, the defendant was picked up by an officer and driven to the police station. At the station, the defendant volunteered that there might be a warrant in another county for his arrest, and a computer records check confirmed that that was indeed the case. The officer arrested the defendant. As officers were booking the defendant, they discovered a box of cigarettes that tended to connect him to a burglary; the defendant also made several inculpatory admissions.

On appeal, as pertinent here, the defendant reiterated arguments rejected by the trial court: that the police had unlawfully stopped him without reasonable suspicion and that the subsequently discovered evidence was "fruit of the poisonous tree" and should therefore have been suppressed. 72 Or App at 363. We concluded that we did not need

to address the former argument because we agreed with the trial court on the latter, relying exclusively on *Dempster*:

"Under *[Dempster]*, [the officers'] discovery of the arrest warrant and [the] arrest of defendant under the warrant's authority purged the evidence from the taint of the prior illegality. The Supreme Court in *Dempster* assumed that the police may have unlawfully taken the defendant to the police station. While the defendant was there, an officer discovered a bench warrant for his arrest. The officer then conducted a search incident to the arrest and found narcotics and related paraphernalia on the defendant's person. The court held that the intervening discovery of the bench warrant dissipated the taint of the illegal detention because 'when the sergeant found the warrant he was bound to obey its command and arrest defendant.'"

*Snyder*, 72 Or App at 364. In addition, we noted that "*Dempster* declares it irrelevant that prior illegality may have tainted the search; even if there was a taint, it was purged by the intervening discovery of the bench warrant." *Id.*

Some 20 years after *Snyder*, the Oregon Supreme Court decided *State v. Hall*, 339 Or 7, 115 P3d 908 (2005). The defendant sought suppression in *Hall* of evidence obtained by the police as a result of a consensual search of his person after he had been unlawfully seized. The *Hall* court established the analysis to be used when a defendant seeks suppression in such circumstances:

"Although the aim of the Oregon exclusionary rule is to restore a defendant to the same position as if 'the government's officers had stayed within the law,' this court has rejected the notion that evidence is rendered inadmissible under Article I, section 9, simply because it was obtained after unlawful police conduct or because it would not have been obtained 'but for' unlawful police conduct. Instead, as this court recently explained in *State v. Johnson*, 335 Or 511, 520-21, 73 P3d 282 (2003), after a defendant establishes the existence of a minimal factual nexus—that is, at minimum, the existence of a 'but for' relationship—between the evidence sought to be suppressed and prior unlawful police conduct, the state nevertheless may establish that the disputed evidence is admissible under Article I, section 9, by proving that the evidence did not derive from

the preceding illegality. To make that showing, the state must prove that either (1) the police inevitably would have obtained the disputed evidence through lawful procedures even without the violation of the defendant's rights under Article I, section 9; (2) the police obtained the disputed evidence independently of the violation of the defendant's rights under Article I, section 9; or (3) the preceding violation of the defendant's rights under Article I, section 9, has such a tenuous factual link to the disputed evidence that that unlawful police conduct cannot be viewed properly as the source of that evidence."

*Id.* at 24-25 (some citations omitted).

Accordingly, the purpose of the Oregon exclusionary rule is to "vindicate" a defendant's personal rights by restoring the defendant to the same position as if "the government's officers had stayed within the law." *Id.* (internal quotation marks omitted). Once the defendant has shown a minimal factual nexus between the unlawful police conduct and the evidence sought to be suppressed, the state may seek to establish that the unlawful police conduct was "independent of or tenuously related to" the event giving the police authority to search. Assessing whether the state has met "that burden requires a fact-specific inquiry into the totality of the circumstances to determine the nature of the causal connection." *Id.* at 35.

"Although determining the existence of such a causal connection requires examination of the specific facts at issue in a particular case, we view several considerations to be relevant to that determination, including (1) the temporal proximity between the unlawful police conduct and the defendant's consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances—such as, for example, a police officer informing the defendant of the right to refuse consent—that mitigated the effect of the unlawful police conduct."

*Id.* Under *Hall*'s suppression analysis, then, the question whether the discovery of evidence was attenuated from prior unlawful police conduct is a fact-driven analysis into the "totality of the circumstances," including intervening circumstances.

Defendant asks us to conclude that the principle that discovery of a valid arrest warrant and consequent arrest of a person purges subsequently discovered evidence of the taint of a preceding unlawful seizure of the person was only *dictum* in *Dempster*. He further asks us to conclude that *Hall* implicitly overruled *Snyder* to the extent that *Snyder* relied on that principle. The state responds that the central principle of *Snyder*, derived from *Dempster*, is not inconsistent with *Hall*. It contends that the Supreme Court recognized in *Hall* that certain intervening events will always serve to attenuate the taint of prior unlawful police conduct. In its view, the principle of *Snyder* and *Dempster* that discovery of an outstanding warrant serves to attenuate such taint is consistent with the Supreme Court's view of attenuation in *Hall*. It further notes that we have acknowledged that consistency in post-*Hall* cases in which we have applied the principle of *Snyder* and *Dempster*, specifically in *State v. Langston*, 223 Or App 590, 594, 196 P3d 84 (2008), and *State v. Allen*, 222 Or App 71, 77-79, 191 P3d 762, *rev den*, 345 Or 503 (2008).

In essence, defendant would have us conclude that we should overrule *Snyder* because *Snyder* is inconsistent with *Hall*. However, if *Snyder* was inextricably derived from *Dempster*, then it is for the Supreme Court, not us, to decide whether to revisit the question whether an intervening arrest warrant always purges subsequently discovered evidence of the taint of prior unlawful police conduct. And even if *Snyder* was not directly derived from *Dempster*, then defendant must demonstrate that *Snyder* is plainly wrong. *See Newell v. Weston*, 156 Or App 371, 380, 965 P2d 1039 (1998), *rev den*, 329 Or 371 (1999) (Court of Appeals will not overrule its own decision construing a statute unless construction is determined to be plainly wrong); *see also State v. Copeland*, 247 Or App 362, 370, 270 P3d 313 (2011), *aff'd*, 353 Or 816, 306 P3d 610 (2013) (same standard applied to constitutional issue). Because defendant has not demonstrated that *Snyder* is plainly wrong, we may not reverse the trial court's denial of defendant's suppression motion under Article I, section 9.

We disagree with defendant that *Hall* implicitly overruled the principle expressed in *Dempster* and *Snyder* or that that principle is incompatible with the analysis outlined

in *Hall*. We have recognized as much in the two post-*Hall* warrant-attenuation cases cited by the state, in which we discussed and relied on *Hall* and applied the principle of *Dempster* and *Snyder* to conclude that, where evidence is discovered incident to an arrest under a valid warrant, the evidence is purged of the taint of any prior unlawful police conduct.

In *Langston*, police officers saw the defendant driving a van that was having engine trouble. After the defendant parked the van, the officers pulled alongside it. One of the officers then asked for and obtained the defendant's name and date of birth. A warrant check revealed the existence of a warrant for the defendant's arrest. The officers arrested the defendant and inventoried the van in preparation for having it towed; that inventory revealed a backpack containing items suggesting that the defendant was involved in identity theft.

The defendant argued that he had been unlawfully seized when the officers asked him for his name and date of birth and that evidence derived from that seizure should have been suppressed under *Hall*. The state responded that, among other things, even if the defendant had initially been unlawfully seized, the subsequent discovery of the arrest warrant purged any taint from the unlawful seizure. We agreed with the state on that point, concluding that "the discovery of the outstanding arrest warrant and its subsequent execution interrupted any causal connection between any purported unlawful stop and the seized evidence and provided an independent and alternative basis for the search of the automobile and defendant's backpack." 223 Or App at 594. We cited both *Dempster* and *Snyder* in support of that conclusion, and, notably, we used the phrase "causal connection," a phrase taken directly from *Hall*. We also noted that we had "recently ratified [the] principle" of *Dempster* in two cases that we had decided after *Hall*. *Id.* at 595 (citing *Allen*, 222 Or App at 79, and *State v. La France*, 219 Or App 548, 558, 184 P3d 1169 (2008), *rev den*, 349 Or 664 (2011)). We concluded by stating that "[a]pplying the *Dempster/Snyder* rule to this case, the discovery and execution of the outstanding warrant for defendant's arrest purged the taint of any prior unlawful stop." *Id.*

In *Allen*, we concluded that the police had arrested the defendant unlawfully, because, at the time of the arrest, they did not have probable cause to believe that he had committed a crime. 222 Or App at 77. While he was under unlawful arrest, the defendant told the officers that there were outstanding warrants for his arrest. One of the arresting officers then searched the defendant's jacket and found evidence of identity theft and forgery, which evidence the defendant sought to suppress. As in the present case, the defendant argued that he was entitled to suppression under *Hall*; as in the present case, the state argued that suppression was not appropriate under *Dempster/Snyder. Id.* at 77-79.

In *Allen*, we expressly applied the *Hall* analysis and integrated the *Dempster* principle into it. We began by noting that the defendant had "established the required minimum factual nexus between the evidence sought to be suppressed * * * and the prior unlawful police conduct." *Id.* at 78. We then considered whether the state had "carried its burden under *Hall* to prove that the preceding violation of defendant's rights under Article I, section 9, has such a tenuous factual link to the disputed evidence that the unlawful police conduct cannot be viewed properly as the source of that evidence." *Id.* Immediately after that statement, we proceeded to discuss the *Dempster* principle. We then stated that "[b]ased on the above circumstances, we conclude, as we did in *Snyder*, that the *intervening and independent* event of the discovery of the outstanding arrest warrants operated to attenuate the taint of the prior unlawful arrest." *Id.* at 79 (emphasis added).

Defendant argues that, because *Langston* and *Allen* conflict with *Hall*, they were wrongly decided. We disagree with defendant that those cases necessarily conflict with *Hall* and, consequently, that *Snyder* and those cases are plainly wrong. Instead, those cases establish the reverse: that *Snyder* can be understood to be consistent with *Hall* and, accordingly, is not plainly wrong. Both *Langston* and *Allen* confirm that *Snyder* can be applied within the *Hall* framework, *viz.*, at the second step of the *Hall* analysis, that is, in assessing whether the state has met its burden of showing that "the police obtained the disputed evidence independently of the violation of the defendant's rights under

Article I, section 9." *Hall*, 339 Or at 25.[1] As we said in *Allen* and *Langston*, the discovery of a valid warrant is an "intervening and independent" event that severs the causal connection between the unlawful police conduct and the discovery of the disputed evidence for purposes of Article I, section 9, as analyzed under the *Hall* framework.

We further note that *Snyder* is not inconsistent with the general purpose of the exclusionary rule as explained in *Hall*: to restore the defendant to the same position that the defendant would have enjoyed had the police acted lawfully. Once the officers discovered the warrant for defendant's arrest, they were "bound to obey its command and arrest defendant." *Dempster*, 248 Or at 407. No one contends that the principle behind the Oregon exclusionary rule—namely, to restore the defendant to the position that the defendant would have enjoyed had the police acted lawfully—could, or should, operate to negate the arrest pursuant to the warrant. The most that defendant could obtain is the suppression of the evidence; defendant cannot be put back in the position of not having been arrested. Because that is the case, and because the police are authorized to conduct a lawful search incident to that arrest, *see, e.g., State v. Hite*, 198 Or App 1, 107 P3d 677 (2005), the concept of restoring defendant to the position that he would have enjoyed had the police acted lawfully seems inapposite in those circumstances, *viz.*, when applied to evidence obtained after a lawful arrest. Moreover, *Hall* itself "rejected the notion that evidence is rendered inadmissible under Article I, section 9, simply because it was obtained after unlawful police conduct or because it would not have been obtained 'but for' unlawful police conduct." *Hall*, 339 Or at 25. The trial court properly denied the motion to suppress under Article I, section 9, of the Oregon Constitution.

Defendant next contends that suppression was required under the Fourth Amendment. Defendant cites decisions of the United States Courts of Appeal for the

---

[1] Of course, the state may also discharge that burden by showing that the evidence would inevitably have been discovered by lawful police procedures or that the discovery of the evidence had such a tenuous factual link with the unlawful police conduct that the latter cannot be said to be the source of the former. *See Hall*, 339 Or at 25.

Sixth, Ninth, and Tenth Circuits for the proposition that "[a]n illegal seizure does not excuse the taint of an illegal stop where the warrant is discovered through means that cannot be differentiated from the illegal stop." In turn, the state argues that *Dempster* is a rule of federal constitutional law and is therefore dispositive of the Fourth Amendment issue as well.

As noted, for its conclusion that the discovery of an arrest warrant attenuates the taint of an unlawful stop, *Dempster* cited two United States Supreme Court cases, *Nardone* and *Wong Sun*. While subsequent decisions of this court have made clear that *Dempster* is a rule of Oregon law, *Dempster* itself relied only on federal law for its conclusion on suppression. On questions of federal law, we are bound by decisions of the United States Supreme Court and of the Oregon Supreme Court. *Fox v. Collins*, 213 Or App 451, 463-64, 162 P3d 998 (2007). The rule announced in *Dempster* represents the Oregon Supreme Court's understanding of the federal exclusionary rule in this Fourth Amendment context. While it is true that the United States Supreme Court has developed attenuation analysis more extensively since *Dempster* was decided, *see Brown v. Illinois*, 422 US 590, 95 S Ct 2254, 45 L Ed 2d 416 (1975), it has never directly addressed whether the discovery of evidence as a result of an arrest pursuant to a warrant is attenuated from a preceding unlawful seizure. *Dempster* did directly address that issue, and, whatever the correctness of the rule announced in that case, in the absence of directly contrary authority from the United States Supreme Court, we are bound by the Oregon Supreme Court's decision in *Dempster*.

Despite defendant's arguments otherwise, the rule of *Dempster*—that the discovery of an arrest warrant is an intervening circumstance that severs the causal connection between an unlawful stop and a subsequent search—continues to be the rule under Article I, section 9, for suppression analysis. The Oregon Supreme Court's decision in *Dempster* controls our analysis for purposes of the Fourth Amendment as well. The trial court did not err in denying defendant's suppression motion.

Affirmed.

**EGAN, J.,** dissenting.

I agree with the majority's reasoning with respect to its suppression analysis under Article I, section 9, of the Oregon Constitution. Because I do not agree, however, that the Oregon Supreme Court's decision in *State v. Dempster*, 248 Or 404, 434 P2d 746 (1967) controls with respect to the analysis of the federal exclusionary rule, I respectfully dissent.

Although I rely on the facts as provided in the majority's opinion, I must note at the outset what I believe to be *the* critical fact of this case. The record before us leaves no room to conclude other than that the officers were unlawfully detaining defendant for the purpose of identifying him and running a warrant check on his name. With that, I proceed to my analysis.

*Dempster* was decided in 1967 and cited two United States Supreme Court cases to support its conclusion that the discovery of an arrest warrant attenuated an illegal seizure from the subsequent discovery of evidence. *Id.* One of those cases was *Wong Sun v. United States*, 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963), a case that framed the ultimate question under the Fourth Amendment as whether the illegal detention and the evidence sought to be suppressed has "become so attenuated as to dissipate the taint" of the illegal detention.[1] *Wong Sun*, 371 US at 491 (internal quotation marks omitted). In that case, the Supreme Court stated:

> "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)."

*Id.* at 487-88.

_____

[1] The other was *Nardone v. United States*, a case which did not involve the Fourth Amendment. 308 US 338, 60 S Ct 266, 84 L Ed 307 (1939).

The United States Supreme Court extensively developed and refined Fourth Amendment attenuation analysis with its decision in *Brown v. Illinois*, 422 US 590, 95 S Ct 2254, 45 L Ed 2d 416 (1975). In *Brown*, police unlawfully arrested a defendant without probable cause and without a warrant. The defendant was subsequently given *Miranda* warnings, after which he made self-incriminating statements that he subsequently moved to suppress. The state argued that the *Miranda* warnings served to sufficiently attenuate the taint of the illegal arrest such that suppression was not required. The Supreme Court declined to adopt a *per se* rule that the issuance of *Miranda* warnings automatically attenuates the taint of a prior unlawful arrest from a defendant's subsequent statements. Instead, the court stated that whether suppression is required depends on "the facts of each case" and proceeded to identify three nonexclusive factors that may bear on whether suppression is required in any given instance: (1) the temporal proximity of the arrest and the confession, (2) the presence of intervening circumstances, and, (3) the purpose and flagrancy of the official misconduct (the "*Brown* factors"). *Id.* at 603-04. Applying those factors, the court concluded that the defendant's confession should have been suppressed.

*Brown* was decided in 1975 and since then no Oregon case has squarely addressed the proper attenuation analysis under the Fourth Amendment when an arrest warrant is discovered during an unlawful detention. The Oregon Supreme Court has not addressed the matter since *Dempster*, which was decided eight years before *Brown*. In *State v. Langston*, 223 Or App 590, 594 n 3, 196 P3d 84 (2008), we explicitly declined to address a defendant's Fourth Amendment claim. In *State v. Allen*, 222 Or App 71, 73, 191 P3d 762, *rev den*, 345 Or 503 (2008), the state appealed the trial court's decision under Article I, section 9; the Fourth Amendment was not at issue. In *State v. Snyder*, 72 Or App 359, 363, 695 P2d 958, *rev den*, 299 Or 251 (1985) (citing *Terry v. Ohio*, 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968) and *Dunaway v. New York*, 442 US 200, 99 S Ct 2248, 60 L Ed 2d 824 (1979)), the defendant argued that his detention was unlawful under both Oregon law and the Fourth Amendment. Thus, it appears that *Snyder* is the only Oregon

case—other than *Dempster*—that has addressed whether, for Fourth Amendment purposes, the taint of an unlawful stop is purged by the discovery of an arrest warrant.

We did not explicitly state in *Snyder* whether we were analyzing attenuation under federal or state law. Instead, we merely cited *Dempster* to support our conclusion that the defendant was not entitled to suppression of the evidence. *Dempster*, however, differed from *Snyder* in a crucial respect. In *Dempster*, the police already knew the identity of the defendant before they detained him. 248 Or at 405. The defendant was taken to the station house for the purpose of investigating a crime that the officers believed that an associate of his was involved in. That was not the case in *Snyder*, for the officer in that case seized the defendant by taking him to the police station in order "to find out who the defendant was." 72 Or App at 362 (internal quotation marks omitted). *Snyder* thus extended *Dempster*'s holding, even in the wake of *Brown*, to situations where the police unlawfully seized a defendant for the purpose of identifying him. Although I agree with the majority that we are bound by the Oregon Supreme Court's decision in *Dempster*, I would conclude that the extension of *Dempster* that was announced in *Snyder* is, with respect to the Fourth Amendment analysis, plainly wrong. *See* 258 Or App at 25 (discussing when the Court of Appeals will overrule a prior decision).

I would so conclude because it cannot be said, as a matter of federal law, that evidence discovered during a search incident to arrest is *automatically* attenuated from a prior unlawful seizure by the discovery of an outstanding warrant where the unlawful seizure was carried out for the purpose of identifying the person detained. First, *Wong Sun*, the case on which *Dempster* relied, did not itself purport to create any *per se* rule. To the contrary, *Wong Sun* framed the proper inquiry as whether "the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." 371 US at 488 (internal quotation marks omitted). From that language, it would be difficult to extrapolate a rule that says that an arrest made pursuant to an outstanding warrant always attenuates

evidence discovered during a search incident to that arrest from a preceding unlawful detention. Indeed, the Oregon Supreme Court has stated that *Wong Sun* did not establish such a *per se* rule, stating that "a defendant's voluntary statements *may* be the inadmissible 'fruits' of a prior Fourth Amendment violation." *State v. Hall*, 339 Or 7, 21, 115 P3d 908 (2005) (emphasis added). Moreover, as noted, *Brown* explicitly rejected application of a *per se* rule to attenuation analysis, stating that "[t]he workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test." 422 US at 603.

Second, the federal exclusionary rule's purpose is to deter police misconduct. *See, e.g., Elkins v. United States*, 364 US 206, 217, 80 S Ct 1437, 4 L Ed 2d 1669 (1960). A rule that states flatly—as the majority says that the rule in *Snyder* does—that suppression is never appropriate in the wake of unlawful police conduct, regardless of the purpose or flagrancy behind the unlawful conduct, is incompatible with such a purpose. That is why the United States Supreme Court has explained that "[e]ven in situations where the exclusionary rule is plainly applicable, we have declined to adopt a '*per se* or "but for" rule' that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest." *United States v. Ceccolini*, 435 US 268, 276, 98 S Ct 1054, 1060, 55 L Ed 2d 268 (1978) (citing *Brown*, 422 US at 603). Contrariwise, it cannot be that there is a *per se* rule that evidence is always admissible when it was discovered pursuant to a search warrant following an unlawful detention. Such a rule would not serve the underlying purpose of the federal exclusionary rule.

Third, while it is true that *Brown* was decided in a slightly different context from the present one, the overwhelming majority of jurisdictions have concluded that the *Brown* factors apply to analyze suppression cases involving a search that was carried out pursuant to an arrest warrant that was discovered during an unlawful seizure. *See State v. Mazuca*, 375 SW3d 294 (Tex Crim App 2012), *cert den*, 133 S Ct 1724 (2013) (noting that "[p]ractically every other jurisdiction to address the question of attenuation of

taint to the illegal seizure of physical evidence has deemed it appropriate to apply three of the *Brown* factors"); *see also United States v. Gross*, 662 F3d 393 (6th Cir 2011); *United States v. Simpson*, 439 F3d 490 (8th Cir 2006); *United States v. Green*, 111 F3d 515 (7th Cir 1997); *McBath v. State*, 108 P3d 241 (Alaska Ct App 2005); *State v. Hummons*, 227 Ariz 78, 253 P3d 275 (2011); *State v. Frierson*, 926 So 2d 1139 (Fla), *cert den*, 549 US 1082 (2006); *State v. Page*, 140 Idaho 841, 103 P3d 454 (2004); *People v. Mitchell*, 355 Ill App 3d 1030, 291 Ill Dec 786 (2005); *State v. Moralez*, 300 P3d 1090 (Kan 2013); *State v. Hill*, 725 So 2d 1282 (La 1998); *Myers v. State*, 395 Md 261, 909 A2d 1048 (2006); *Jacobs v. State*, 128 P3d 1085 (Okla Crim App 2006); *State v. Strieff*, 286 P3d 317 (Utah Ct App 2012), *rev allowed*, 298 P3d 69 (Utah 2013) (all applying *Brown* factors to analyze the attenuation of a search that followed an arrest made pursuant to a warrant that was discovered during an illegal detention). Although we are obviously not bound by the cited cases, I find it overwhelmingly persuasive, for purposes of considering the validity of *Snyder*'s extension of *Dempster*, that every court that I can find to have considered the matter has concluded that the United States Supreme Court announced the proper analytical framework in *Brown*.

In sum, although we are, of course, bound by the Oregon Supreme Court's decision in *Dempster*, that case did not cover the situation at issue here, *viz.*, where defendant was seized for the purpose of identifying him. Although that issue was addressed by this court in *Snyder*, that case does not, as demonstrated, accurately reflect the proper Fourth Amendment analysis. For the reasons above, I would conclude that the suppression analysis articulated in *Brown* is the proper analytical framework under which to examine this case. Consequently, I would proceed to apply the *Brown* factors to the present case.

The first *Brown* factor is temporal proximity between the unlawful detention and the discovery of the evidence sought to be suppressed. The trial court did not make explicit findings concerning how much time had expired between the unlawful detention and the discovery of the evidence; however, it is clear from the record that those two events

were almost contemporaneous in time and identical in location. Although the unlawful detention and the discovery of the evidence occurred very close to one another, for the reasons explained below, I would not weigh this factor heavily in comparison with the other *Brown* factors.

The next factor is the presence, *vel non*, of intervening circumstances. Courts have reached widely varying conclusions about whether the discovery of an arrest warrant constitutes an intervening circumstance that attenuates the taint of the unlawful detention. *Compare Simpson*, 439 F3d at 495 ("Where the discovery of an arrest warrant constitutes the intervening circumstance, it is an even more compelling case for the conclusion that the taint of the original illegality is dissipated." (Internal quotation marks omitted.)), *with Hummons*, 227 Ariz at 81 ("[T]he subsequent discovery of a warrant is of minimal importance in attenuating the taint from an illegal detention upon evidence discovered during a search incident to an arrest on the warrant."), *and Gross*, 662 F3d at 405 ("[T]he discovery of the outstanding warrant resulted from means that are indistinguishable from the illegal stop, and thus the warrant does not dissipate the taint of the unlawful detention in this case."). I would conclude that, in this case, the discovery of the intervening warrant was of minimal importance as an intervening circumstance. I would do so because the facts of this case leave no room to conclude other than that the police were detaining defendant for the very purpose of identifying him and running a warrant check on him. The police seized defendant until they could bring an officer to the scene who recognized defendant and then immediately used that identification to run a warrant check. The existence of the warrant was thus discovered through "means that are indistinguishable from the illegal stop." *Id.* In the present circumstances, the discovery of the warrant was of minimal importance as an intervening circumstance.

The last *Brown* factor is the purpose and flagrancy of the police conduct. That factor weighs very heavily in the analysis because it goes to the heart of the federal exclusionary rule's purpose, which is to "deter—to compel respect

for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it ***." *Elkins*, 364 US at 217; *see Herring v. United States*, 555 US 135, 144, 129 S Ct 695, 172 L Ed 2d 296 (2009) ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it."). Indeed, the focus in determining whether to apply the rule is on "the efficacy of the rule in deterring Fourth Amendment violations in the future." *Id*. Thus, both the purpose and flagrancy of the police misconduct play an outsized role in our suppression analysis, for if there was no misconduct that would be deterred by suppression of the evidence, then there is no reason to suppress.

As a starting point, there is no question in this case that the police validly stopped the car for the driver's failure to properly signal a turn.[2] Moreover, there is no dispute that the officers were, at first, validly investigating the driver's failure to provide proof of adequate insurance. However, the trial court found that the officers could have concluded citing the driver for those infractions within five minutes of the stop's initiation. Another 25 minutes then elapsed—during which time defendant was seized without reasonable suspicion of his involvement in criminal activity—until officers were able to obtain the information they were after, *i.e.*, an identification of defendant. Officer Stradley testified that he ran the warrant check on defendant "as soon as" Officer Burley arrived and identified defendant. In short, the record leaves no doubt that the officers were detaining defendant—in violation of the Fourth Amendment—for the purpose of identifying him and running a warrant check. The Fourth Amendment has long prohibited such actions. *See, e.g., Illinois v. Caballes*, 543 US 405, 407, 125 S Ct 834, 160 L Ed 2d 842 (2005) (a traffic stop may become "unlawful if it is prolonged beyond the time reasonably required to complete [its] mission"); *Florida v. Royer*, 460 US 491, 500, 103

---

[2] In considering the purpose and flagrancy of police misconduct, I think it of no importance that the stop was pretextual, *i.e.*, that the officers were motivated to conduct the stop for reasons other than the improper signaling of a turn. The Fourth Amendment renders an officer's subjective intentions irrelevant, so long as the stop is supported by objective probable cause or reasonable suspicion. *Whren v. United States*, 517 US 806, 813, 116 S Ct 1769, 135 L Ed 2d 89 (1996). The fact that the officers were interested in investigating things other than the improper turn does not render their initial stop of the vehicle "misconduct."

S Ct 1319, 75 L Ed 2d 229 (1983) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."). I would thus conclude that, after consideration of the *Brown* factors—as applied in light of the exclusionary rule's purpose—the evidence derived from the stop should have been suppressed.

In discussing the purposefulness of an unlawful seizure, the *Brown* court stated that "[t]he arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up." *Brown*, 422 US at 605. That statement is equally applicable here. The Sixth Circuit has convincingly articulated the overarching reason why I believe suppression is required in this case:

> "To hold otherwise would create a rule that potentially allows for a new form of police investigation, whereby an officer patrolling a high crime area may, without consequence, illegally stop a group of residents where he has a 'police hunch' that the residents may: 1) have outstanding warrants; or 2) be engaged in some activity that does not rise to a level of reasonable suspicion. Despite a lack of reasonable suspicion, a well-established constitutional requirement, the officer may then seize those individuals, ask for their identifying information (which the individuals will feel coerced into giving as they will have been seized and will not feel free to leave or end the encounter), run their names through a warrant database, and then proceed to arrest and search those individuals for whom a warrant appears. Under this scenario, an officer need no longer have reasonable suspicion [or] probable cause, the very crux of our Fourth Amendment jurisprudence."

*Gross*, 662 F3d at 404-05.

The federal exclusionary rule exists to deter police misconduct. The police misconduct in this case produced exactly the result that the officers hoped to obtain when they engaged in it. The *per se* approach applied by the majority does not accurately reflect the correct approach to analyzing suppression under the federal exclusionary rule. The 45-year-old case of *Dempster* did not address the situation that we are confronted with here, and thus, does not compel the result reached by the majority. Our decision in *Snyder*

does not compel today's result either; that case incorrectly extended the rule in *Dempster*, and continued adherence to *Snyder* thwarts the very purpose that the federal exclusionary rule is designed to serve. As every other jurisdiction to have considered the matter has recognized, the United States Supreme Court announced the proper suppression analysis in *Brown*. I would apply the *Brown* factors in light of the purpose that the federal exclusionary rule exists to serve, and I would conclude that the trial court erred by not suppressing the evidence derived from the illegal stop.

I respectfully dissent.