486 November 6, 2014 No. 69

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

CLARK ALLEN BAILEY,
aka Clarke Allen Bailey,
*Petitioner on Review.*

(CC 101033810; CA A148109; SC S061647)

En Banc

On review from the Court of Appeals.*

Argued and submitted May 6, 2014.

Anne Fujita Munsey, Senior Deputy Public Defender, Salem, argued the cause and filed the briefs for petitioner on review. With her on the briefs were Peter Gartlan, Chief Defender, and Daniel Bennett, Deputy Public Defender.

Anna M. Joyce, Solicitor General, Salem, argued the cause and filed the brief for respondent on review. With her on the brief were Ellen F. Rosenblum, Attorney General, and Peenesh H. Shah, Assistant Attorney General.

BREWER, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

_____
* Appeal from Multnomah County Circuit Court, Edward J. Jones, Judge, 258 Or App 18, 308 P3d 368 (2013).

**BREWER, J.**

Police officers unlawfully detained defendant when he was a passenger in a car. During that unlawful detention, the officers ascertained defendant's identity and ran a warrant check, which revealed that defendant was the subject of an outstanding arrest warrant. The officers arrested defendant and, during a search incident to arrest, discovered that he was in possession of illegal drugs. Based on that evidence, the state prosecuted defendant for various drug offenses. Defendant moved to suppress the evidence under the state and federal exclusionary rules, which, subject to certain exceptions—including the attenuation exception—prohibit the state from using at trial evidence that was obtained as a result of an unreasonable search or seizure. *See State ex rel Dept. of Human Services v. W. P.*, 345 Or 657, 664-69, 202 P3d 167 (2009) (describing operation of exclusionary rules under Article I, section 9, of the Oregon Constitution, and the Fourth Amendment to the United States Constitution). As explained below, this case requires us to consider whether, under the Fourth Amendment, the discovery and execution of a valid warrant for defendant's arrest sufficiently attenuated the connection between defendant's unlawful detention and evidence found in the search incident to his arrest so as to permit the state to use the evidence against defendant at trial.

The circuit court and the Court of Appeals rejected defendant's arguments and applied a *per se* rule to the attenuation analysis: The discovery and execution of a valid arrest warrant necessarily break the connection between preceding unlawful police conduct and a search incident to the arrest. *State v. Bailey*, 258 Or App 18, 308 P3d 368 (2013). The Court of Appeals drew that rule from this court's decision in *State v. Dempster*, 248 Or 404, 434 P2d 746 (1967). *Bailey*, 258 Or App at 21-29. For the reasons explained below, we conclude that *Dempster*'s *per se* rule is inconsistent with the subsequent development of the Fourth Amendment attenuation exception set out in *Brown v. Illinois*, 422 US 590, 95 S Ct 2254, 45 L Ed 2d 416 (1975), where the United States Supreme Court rejected such an approach. *Id.* at 603. Instead, *Brown* requires courts to consider three factors in the attenuation analysis: (1) the temporal proximity between

unlawful police conduct and the discovery of challenged evidence; (2) the presence of intervening circumstances; and (3) "particularly, the purpose and flagrancy of the official misconduct." *Id.* at 603-04. Applying those factors in this case, we conclude that the circuit court erred in denying defendant's motion to suppress.

## I.  BACKGROUND

In reviewing the denial of a motion to suppress, we are bound by the circuit court's findings of historical fact that are supported by evidence in the record. *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991). If the circuit court does not make findings on all pertinent historical facts and there is evidence from which those facts could be decided more than one way, we will presume that the court found facts in a manner consistent with its ultimate conclusion. *Id.* at 127. On review, our role is to decide whether the court correctly applied the law to those historical facts. *State v. Holdorf*, 355 Or 812, 814, 333 P3d 982 (2014). The factual record in this case is largely uncontested for purposes of our review. We set out the pertinent facts as follows.

During a period of escalating gang violence, numerous gang members attended the funeral of an associate in Portland. Police officers were concerned that the funeral would spark additional violence, so they monitored a house where gang members had gathered after attending the funeral. An officer in an aircraft saw several people leave the house and get into a car that the officer thought might be a rental car. According to one officer, gang members often use rental cars for drive-by shootings and other crimes. The airborne officer asked a patrol unit to stop the car. The patrol unit did so after observing the driver commit a minor traffic violation.

Defendant was a passenger in the back seat of the car when it was stopped. A patrol officer asked the driver for identification and proof of insurance. The driver produced her driver license, confirmed that the car was a rental, and provided an expired insurance card. The driver stated that, although the card showed that her insurance coverage had expired, she still had coverage through the same insurer. The officer went to his patrol

car to contact the driver's insurance company and deter-
mine whether the driver had maintained coverage. While
doing so, the officer asked his partner to determine the
identities of the passengers, including defendant. When
that officer asked defendant for his name, defendant
refused to provide it.

Soon after the patrol unit stopped the car, four
back-up officers arrived, including Officer Stradley. Stradley
recognized defendant as a gang associate, but he did not
remember defendant's name. Stradley asked for defendant's
identification, but defendant again refused. Stradley then
asked Officer Burley to come to the scene for the express
purpose of identifying defendant and another passenger
who also had refused to identify himself. Burley was work-
ing on a gang unit at the time, and Stradley "thought maybe
he'd be able to recognize these guys." Burley, however, was
engaged in other work and did not arrive for another 25
minutes. During that time, Stradley attempted to obtain a
list of individuals associated with the driver, hoping that it
would jog his memory. Stradley testified that it would have
been against Stradley's interest to inform defendant that he
was free to leave because Stradley wanted to have defendant
identified. During the course of the stop, one of the officers
told the driver that the stop would go faster if the driver
would identify the passengers in the car.

Burley and his partner arrived approximately 30
minutes after the patrol unit stopped the car. At that point,
there were eight officers at the scene. Once there, Burley
quickly was able to identify defendant. Stradley immediately
performed a warrant check and learned that defendant was
the subject of an outstanding arrest warrant. Stradley then
arrested defendant pursuant to the warrant. During the
ensuing search incident to defendant's arrest, Burley found
a plastic bag containing a white substance under defendant's
tongue. The substance later was determined to be cocaine.
In the search, officers also found $700 in cash in defendant's
possession.

Based on that evidence, the state charged defendant
with delivery of cocaine, ORS 475.880, possession of cocaine,
ORS 475.884, and tampering with physical evidence, ORS

162.295. Before trial, defendant moved to suppress the evidence discovered during the search incident to arrest. The circuit court concluded that the patrol officers had lawfully stopped the car, but found that the stop should have taken no more than five minutes to complete their investigation of the traffic infraction and determine whether the driver was carrying proof of insurance.[1] After that point, the court concluded, the officers had extended the stop without reasonable suspicion or probable cause, and the stop of the vehicle and its occupants therefore became unlawful. The court also determined that the officers had no reasonable suspicion or probable cause to hold defendant but that he had not been free to leave and, therefore, had been unlawfully detained. The circuit court nevertheless denied defendant's motion to suppress. According to the court, "[O]nce [the officers] discover the warrant[,] it does cure those prior illegalities. And once they discover the warrant, the officers, evidence-wise, are, in effect, home free." Defendant was subsequently convicted after a stipulated facts trial.

On appeal, a divided Court of Appeals panel affirmed the circuit court's suppression ruling. *Bailey*, 258 Or App at 18. In doing so, the Court of Appeals relied heavily on *Dempster*, in which this court had held, under the Fourth Amendment, that the discovery and execution of a valid arrest warrant that produces incriminating evidence in a search incident to the arrest attenuates the taint of preceding unlawful police conduct. *Id.* at 21-28. The Court of Appeals further held—based on its own decisions that had applied the reasoning in *Dempster*—that the discovery and execution of the arrest warrant in this case attenuated the taint of defendant's unlawful detention under Article I, section 9, of the Oregon Constitution. *Id.* at 28. Judge Egan dissented, reasoning that intervening developments in federal constitutional law precluded the outcome that the majority reached. *Id.* at 30-38. Defendant now seeks review in this court and contends that the circuit court erred by denying his motion to suppress.

---

[1] The driver ultimately was cited for failing to signal a turn and for failure to provide current proof of insurance.

## II.   ANALYSIS

### A.   State v. Dempster

To set the stage for our discussion of the applicable constitutional principles, it is helpful to examine in some detail this court's decision in *Dempster*. There, an officer who already knew the defendant spoke with him on the street. The officer recently had learned that the defendant was on probation. During the conversation, the defendant revealed that he was living with a person whom the officer knew was under investigation for criminal activity. The officer either asked or ordered the defendant to come to the police station while the officer contacted the defendant's probation officer. At the station, the officer checked the defendant's records and learned that there was an outstanding warrant for his arrest. The officer placed the defendant under arrest. In a search incident to arrest, the officer found drugs and related paraphernalia in the defendant's possession. *Dempster*, 248 Or at 905-06.

The state charged the defendant with unlawful possession of the drugs and paraphernalia. The defendant moved to suppress the evidence, asserting that the officer unlawfully had detained him before discovering the arrest warrant and that the evidence that the officer had found in the search was "the 'fruit' of an illegal arrest." *Id.* at 407. A majority of this court rejected the defendant's argument. The court did not resolve whether the defendant's initial detention was unlawful. Instead, the court held that, even if the initial detention were unlawful, the evidence was not subject to suppression because the "defendant was lawfully arrested at the police station before he was searched." *Id*. The court concluded that, because the defendant had been "lawful[ly] arrested" under a valid warrant, "the connection between the earlier alleged illegal arrest and the subsequent search had become so attenuated by the intervening legal arrest as to dissipate the taint." *Id.* at 407-08. In reaching that conclusion, the court cited two United States Supreme Court decisions, neither of which the court undertook to link analytically to the factual circumstances presented in *Dempster. See id.* (citing *Wong Sun v. United States*, 371 US 471, 487, 83 S Ct 407, 9 L Ed 2d 441 (1963), and *Nardone v.*

*United States*, 308 US 338, 341, 60 S Ct 266, 84 L Ed 307 (1939)).

Justice O'Connell dissented. He would have concluded that the officer had unlawfully detained the defendant before discovering the warrant and that, as a consequence, the evidence discovered in the search incident to arrest should be suppressed. The dissent

> "[knew] of no other way to discourage this kind of police practice—a practice which, if condoned, would permit arrest and detention without probable cause for the purpose of making exploratory searches."

*Id.* at 408. According to the dissent, "This is precisely the kind of police conduct the Fourth Amendment was intended to proscribe." *Id.*

As noted, the Court of Appeals in this case relied extensively on the majority opinion in *Dempster* for the proposition that, under the federal and state exclusionary rules, the discovery and execution of a valid arrest warrant that produces incriminating evidence in a search incident to the arrest necessarily attenuates the taint of preceding unlawful police conduct. *Bailey*, 258 Or App at 21-28. Defendant initially argues that the facts of this case are materially distinguishable from those in *Dempster* and, thus, that case does not control here. In particular, defendant observes that, in *Dempster*, the officer knew the name of the defendant before unlawfully detaining him, *Dempster*, 248 Or at 405, whereas, in this case, defendant was detained by officers before they knew his identity. According to defendant, that distinction is significant, because the detaining officers in this case were able to ascertain his identity, and thus discover the warrant and arrest him, only as a result of the unlawful detention.

We decline defendant's invitation to distinguish *Dempster* on that basis. To be sure, the constitutional underpinnings and scope of this court's holding in *Dempster* are somewhat opaque.[2] Because the opinion is sparsely reasoned,

---

[2] As noted, this court in *Dempster* relied solely on Fourth Amendment jurisprudence in its limited exploitation analysis. Neither the parties in their briefs nor the court in its opinion cited or discussed the parallel provision of the Oregon Constitution, Article I, section 9.

it could be argued, as defendant asserts, that the scope of its holding should be limited to its particular facts. However, to do so would be disingenuous. *Dempster* has been understood for decades as establishing a *per se* rule under which the discovery and execution of a valid arrest warrant necessarily attenuate the taint of preceding unlawful police conduct, just as it was understood by the dissent in *Dempster* when that case was decided. *Id*. at 408-10. Because of the evident sweep of the rule announced in *Dempster*, we do not agree that the factual distinction on which defendant relies takes this case beyond the reach of *Dempster*'s holding. If, as *Dempster* holds, the discovery and execution of a valid arrest warrant necessarily attenuate the taint of preceding police misconduct, then the nature and extent of the misconduct is not material to the analysis. Thus, the factual distinction that defendant identifies can be material, if at all, only if the *per se* rule set out in *Dempster* is incorrect.

We conclude, therefore, that we must determine whether to follow *Dempster* or whether the legal context "has changed in such a way as to seriously undermine [its] reasoning or result." *Farmers Ins. Co. v. Mowry*, 350 Or 686, 698, 261 P3d 1 (2011). Ordinarily, we would start with an analysis of Oregon constitutional law. *See, e.g.*, *State v. Kennedy*, 295 Or 260, 262-63, 666 P2d 1316 (1983) (explaining methodology). However, we begin with federal law in this case because that is what *Dempster* purported to apply. Moreover, for the past several decades, *Dempster* has been treated as the legal foundation for determining the effect of the discovery and execution of an arrest warrant on preceding unlawful police conduct both under the Fourth Amendment and Article I, section 9.[3] Accordingly, it is necessary to consider at the outset whether that decisional precedent remains viable. *See State v. Probst*, 339 Or 612, 626, 124 P3d 1237 (2005) ("[B]ecause our decisional precedent

---

[3] *See, e.g.*, *State v. Langston*, 223 Or App 590, 594-95, 196 P3d 84 (2008) (concluding, under Article I, section 9, that, "[in *Dempster*], the Supreme Court *** held that an arrest based on an outstanding warrant can serve to attenuate the link between unlawful police conduct and subsequently discovered evidence"); *see also State v. Allen*, 222 Or App 71, 78-79, 191 P3d 762, *rev den*, 345 Or 503 (2008) (same); *State v. La France*, 219 Or App 548, 558, 184 P3d 1169 (2008), *rev den*, 349 Or 664 (2009) (same); *State v. Snyder*, 72 Or App 359, 695 P2d 958, *rev den*, 299 Or 251 (1985).

in this case *** is based on the Sixth Amendment, and because the state's line of reasoning fails if [that precedent] continues to state applicable federal law correctly, we turn to the federal constitutional analysis first.").

B.  *Fourth Amendment Analysis*

As we explained at the outset, the central question that this case presents is: Did the discovery and execution of a valid warrant for defendant's arrest sufficiently attenuate the connection between his preceding unlawful detention and evidence found in the search incident to his arrest so as to permit the state to use the evidence against him? We begin by summarizing the general principles that inform our answer to that question.

The Fourth Amendment to the United States Constitution provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The federal exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect." *United States v. Calandra*, 414 US 338, 348, 94 S Ct 613, 38 L Ed 2d 561 (1974). Because of its remedial nature, courts must "'weigh the likely social benefits of excluding unlawfully seized evidence against the likely costs'" to determine whether the rule applies. *INS v. Lopez-Mendoza,* 468 US 1032, 1042, 104 S Ct 3479, 82 L Ed 2d 778 (1984) (quotation omitted). The exclusionary rule applies not only to the "direct products" of unconstitutional invasions of Fourth Amendment rights, but also to the indirect or derivative "fruits" of those invasions. *See Wong Sun*, 371 US at 484 ("The exclusionary prohibition extends as well to the indirect as the direct products of such invasions." (Citation omitted.)). In this context, "indirect" fruit refers to "evidence [that] was acquired by the police *after* some initial Fourth Amendment violation." *United States v. Crews*, 445 US 463, 471, 100 S Ct 1244, 63 L Ed 2d 537 (1980) (emphasis in original).

There are three recognized exceptions to the Fourth Amendment exclusionary rule: (1) the inevitable discovery exception; (2) the independent source exception; and (3) the attenuation exception.[4] *United States v. Smith*, 155 F3d 1051, 1060 (9th Cir 1998). Because the first two exceptions are not implicated here, we discuss only the attenuation exception. Under that exception, whether fruit is "of the poisonous tree"—in which case it must be excluded at trial—depends on "whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the taint imposed upon that evidence by the original illegality." *Crews*, 445 US at 471.

When this court considered the attenuation exception in *Dempster*, the United States Supreme Court's exclusionary rule jurisprudence was in its early stages of development. The Court's most complete elaboration of both the exclusionary rule and the attenuation exception to date had been set out in *Wong Sun*, which built on an earlier case, *Nardone*. *Wong Sun*, 371 US at 487-88. In *Wong Sun*, the Court declined to require the suppression of evidence "simply because it would not have come to light but for the illegal actions of the police." *Id.* at 488. Instead, the Court distinguished between evidence that is the product of exploitation of unlawful police conduct (which would be excluded) and evidence that was procured by sufficiently distinguishable means such that "the connection between the lawless conduct of the police and the discovery of the challenged evidence has 'become so *attenuated* as to dissipate the taint.'" *Id.* at 487 (emphasis added) (quoting *Nardone*, 308 US at 341).

Although *Wong Sun* and *Nardone* provided a test for the exclusion of tainted evidence, neither case provided much direction about how to apply the test, and neither addressed

---

[4] The doctrine of inevitable discovery allows admission of unlawfully obtained evidence if the government can "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 US 431, 444, 448, 104 S Ct 2501, 81 L Ed 2d 377 (1984). The independent source doctrine permits the introduction of evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality. *Murray v. United States*, 487 US 533, 537, 108 S Ct 2529, 101 L Ed 2d 472 (1988).

how exceptions to the exclusionary rule—including the attenuation exception—would function in practice. Wayne R. LaFave, 6 *Search & Seizure* § 11.4(a) (5th ed) ("In neither *Nardone* nor *Wong Sun* did the Court elaborate upon the 'attenuated connection' test, thus leaving it rather uncertain exactly what it was that lower courts were expected to look for, to say nothing of what facts would be relevant to an 'attenuation' determination."). That was the state of affairs when this court decided *Dempster*. *See Dempster*, 248 Or at 408 (applying *Nardone* and *Wong Sun* without any detailed analysis).

Eight years after *Dempster* was decided, the Supreme Court provided further guidance in *Brown*. In that case, the defendant was unlawfully arrested, received *Miranda* warnings, and then made two confessions. 422 US at 593-96. The Illinois Supreme Court had refused to suppress the confessions after having adopted a *per se* rule that *Miranda* warnings necessarily break the causal connection between an unlawful arrest and a defendant's subsequent confession. *Id.* at 597.

In reviewing that decision, the Supreme Court initially observed that the effect of the *Miranda* warnings was not dispositive because evidence obtained as a result of unlawful police conduct may implicate multiple constitutional protections that operate independently, even though they may intersect. *Id.* at 601-02. In *Brown*, the evidentiary use of the defendant's confession was subject to Fifth Amendment protections, including *Miranda* warnings that are designed to ensure the voluntariness of confessions. *Id.* at 601. However, because it was the product of an unlawful seizure, the evidence also was subject to Fourth Amendment protections. *Id.* Those protections are effectuated by requiring the government to establish an exception to the exclusionary rule, such as attenuation, as a condition of admitting the evidence at trial. *Id.*[5] Accordingly, even though the

---

[5] As a result, even if a confession was "voluntary under the Fifth Amendment, the Fourth Amendment issue remains." *Id.* at 602-03. In that sense, "[t]he voluntariness of the statement is a threshold requirement." *Id.* at 604. If the confession was involuntary, then it likely would be suppressed as the *direct* result of a Fifth Amendment violation rather than the *indirect* result of a Fourth Amendment violation. *Dunaway v. New York*, 442 US 200, 217, 99 S Ct 2248, 60 L Ed 2d 824 (1979) (applying *Brown* and stating, "[i]ndeed, if the Fifth Amendment has been violated, the Fourth Amendment issue would not have to be reached").

demands of the Fifth Amendment were met in *Brown*, the Court engaged in a separate Fourth Amendment analysis.

Echoing Justice O'Connell's dissent in *Dempster*, the Court expressed concern that adopting a *per se* rule would encourage, rather than discourage, unlawful conduct. *Id.* at 602 ("Arrests made without warrant or without probable cause, for questioning or 'investigation,' would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings."). The Court stated that treating the *Miranda* warnings as a "'cure-all'" would "eviscerate[]" the incentive that police officers have to operate within the limits of the Fourth Amendment. *Id.* at 602-03. The Court then set out three factors to determine whether the causal connection between unlawful police conduct and challenged evidence was sufficiently attenuated so as to purge the taint of illegality. *Id.* at 603. Again, those factors are (1) the temporal proximity between unlawful police conduct and the discovery of the evidence; (2) the presence of intervening circumstances; and (3) "particularly, the purpose and flagrancy of the official misconduct." *Id.* at 603-04 (citations omitted). Under that standard, "[n]o single fact is dispositive." *Id.* at 603.

The Supreme Court has not expressly indicated whether the *Brown* framework applies to a fact pattern like the one presented in this case, where challenged evidence was discovered in a search incident to arrest under a valid warrant that was discovered during an unlawful detention. However, in every subsequent case that has come to our attention in which a federal or state court has addressed whether to apply the *Brown* framework, the court has done so, and none has adopted the *per se* rule for which the state advocates. *See, e.g.*, *United States v. Gross*, 662 F3d 393, 401 (6th Cir 2011); *United States v. Simpson*, 439 F3d 490, 495 (8th Cir 2006); *United States v. Green*, 111 F3d 515, 521 (7th Cir 1997); *State v. Mazuca*, 375 SW3d 294, 304 (Tex Crim App 2012).

That authority notwithstanding, the state asserts that the Supreme Court's decision in *Hudson v. Michigan*, 547 US 586, 126 S Ct 2159, 165 L Ed 2d 56 (2006), marked a significant departure from the *Brown* framework for

analyzing attenuation and that *Hudson*, instead, governs the analysis in this case. For the following reasons, we conclude that the state is mistaken.

In *Hudson*, officers executed a valid search warrant at a residence in a manner that violated the so-called "knock-and-announce rule."[6] *Id.* at 588. The Supreme Court declined to suppress the evidence produced by the search. In reaching that decision, the Court made three holdings. First, the Court held that there was no "but for" causation between the discovery of the evidence and the violation of the knock-and-announce rule. The Court stated that, because the officers in that case were executing a search warrant, they would have discovered the evidence even if they had complied with the knock-and-announce rule. *Id.* at 592. Second, the Court held that, even if the violation of the knock-and-announce rule led to the discovery of the evidence, the violation of that rule did not implicate any interest protected by the exclusionary rule. *Id.* at 593-94.[7] Third, the Court held that the exclusion of evidence for a violation of the knock-and-announce rule was not otherwise justified, considering the costs of excluding inculpatory evidence against the benefits of deterring knock-and-announce violations. *Id.* at 594-99.

We readily conclude that *Hudson* did not supplant or alter the attenuation framework that the Court adopted in *Brown*; instead, the Court in *Hudson* concluded that the rationale for applying the exclusionary rule was inapplicable

---

[6] The "knock-and-announce" rule is a subset of the reasonableness requirement of the Fourth Amendment; for a search to be reasonable, police officers must generally knock and announce their presence, unless the circumstances are such that doing so would be unreasonable. *See, e.g.*, *Richards v. Wisconsin*, 520 US 385, 395-96, 117 S Ct 1416, 137 L Ed 2d 615 (1997) (failure to comply with knock-and-announce reasonable because of officer's fears that evidence would be destroyed).

[7] The interests protected by the knock-and-announce rule include (1) "the protection of human life and limb, because an unannounced entry may provoke violence in supposed self-defense by a surprised resident"; (2) the protection of property, because breaking into a house "absent an announcement would penalize someone who" "did not know of the process, of which, if he had notice, it is to be presumed that he would obey it"; and (3) "those elements of privacy and dignity that can be destroyed by a sudden entrance." *Id.* at 594 (quotation and citations omitted). "What the knock-and-announce rule has never protected, however, is one's interest in preventing the government from seeing or taking evidence described in a warrant." *Id.*

to the "knock and announce" context.[8] The state nonetheless asserts that, as in *Hudson*, the rationale for the exclusionary rule is not applicable in this case and, accordingly, there is no justification for engaging in an attenuation analysis under the *Brown* framework. In the state's view, just as the exclusionary rule does not apply to evidence obtained after a "knock-and-announce" violation by police that occurred in the course of executing a valid search warrant, neither does it require the suppression of evidence discovered in a search incident to arrest under a valid arrest warrant, even if the arrest, search, and evidence resulted from a preceding unlawful detention. We conclude that the comparison is inapt.

Unlike the warrant-based search in *Hudson*, this case involves an unlawful detention that was not supported by reasonable suspicion—let alone probable cause. The acquisition of evidence resulting from an unlawful detention goes to the core of the interests protected by the exclusionary rule. *See Silverthorne Lumber Co. v. United States*, 251 US 385, 392, 40 S Ct 182, 64 L Ed 319 (1920) ("The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all."). Moreover, the exclusion of such evidence safeguards the rights of all people—not merely those with something to hide—from unreasonable searches and seizures. *See Brown*, 422 US at 601 ("[The Fourth Amendment] is directed at all unlawful searches and seizures, and not merely those that happen to produce incriminating material or testimony as fruits."). Thus, for example, where the police engage in a fishing expedition in which people are unlawfully detained in the hope of ultimately executing outstanding warrants, the exclusionary rule serves as a deterrent to protect the innocent, not just the guilty, from unreasonable searches and seizures. *State v. Shaw*, 213 NJ 398, 417 64 A3d 499, 510 (2012); *see also People v. Brendlin*, 45 Cal 4th 262, 272, 85 Cal Rptr 3d 496, 504, 195 P3d 1074, 1081 (2008), *cert*

---

[8] The majority opinion in *Hudson* did not mention *Brown*; the dissent referred to *Brown* only to clarify that the attenuation framework set out in *Brown* was not affected by *Hudson*. *Id. at* 619-20 (Breyer, J., dissenting). The majority did not challenge that assertion. *See State v. Grayson*, 336 SW3d 138, 149-50 (Mo 2011) ("*Hudson* did not change the attenuation doctrine, it just found the reason for the exclusionary rule inapplicable to the 'knock and announce' context.").

*den*, 556 US 1192, 129 S Ct 2008, 173 L Ed 2d 1103 (2009) (contrasting the "fishing expedition" scenario with "a chance discovery of an outstanding arrest warrant in the course of a seizure that is later determined to be invalid").

In view of those underpinnings of the exclusionary rule, it comes as no surprise that the cases on which the state relies—including *Hudson*—do not attach constitutional significance to whether a warrant or evidence establishing probable cause to arrest or search *existed* when a constitutional violation occurred; instead, they attach significance to the *officer's knowledge* of the warrant or evidence establishing probable cause to arrest or search. *See Hudson*, 547 US at 593 (whether "the constitutional violation of an illegal manner of entry \*\*\* had occurred or not, the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house"); *see also New York v. Harris*, 495 US 14, 18-19, 110 S Ct 1640, 109 L Ed 2d 13 (1990) (declining to suppress confession after police unlawfully executed a valid warrant, because probable cause to arrest existed); *Henry v. United States*, 361 US 98, 103, 80 S Ct 168, 4 L Ed 2d 134 (1959) ("An arrest is not justified by what the subsequent search discloses."); *United States v. Crawford*, 372 F3d 1048, 1056 (9th Cir 2004) (en banc) ("[T]he presence of probable cause to arrest has proved dispositive when deciding whether the exclusionary rule applies to evidence or statements obtained after the defendant is placed in custody.").[9] By contrast, there is no evidence in this case that the officers who unlawfully detained defendant had any knowledge, either actual or imputed, that justified defendant's detention before they discovered the arrest warrant.[10] Accordingly, the fact that

---

[9] Although there is some flexibility in establishing the requisite knowledge, "even courts that impute knowledge among officers working closely together will not do so absent a close working nexus between the officers during the stop or arrest." *United States v. Shareef*, 100 F3d 1491, 1504 (10th Cir 1996) (citation omitted).

[10] In the context of a Fifth Amendment challenge, the Supreme Court has stated that "[o]ne's identity is, by definition, unique; yet it is, in another sense, a universal characteristic." *Hiibel v. Sixth Judicial Dist.*, 542 US 177, 191, 124 S Ct 2451, 2458, 159 L Ed 2d 292 (2004). Stated differently, a person's identity, when proffered for public view, is inherently "knowable." But, it cannot be credibly argued (nor does the state assert) that the public or knowable nature of one's identity means, for Fourth Amendment purposes, that a person can be indefinitely detained in the hope that some police officer eventually will recognize him or her as a person of criminal interest.

a valid warrant for defendant's arrest existed does not, by itself, mean that the exclusionary rule is inapplicable to a violation of his rights under the Fourth Amendment.

In so concluding, we recognize that police officers who discover a valid arrest warrant in the course of an unlawful search or seizure may arrest the subject of the warrant and conduct a search incident to that arrest. A criminal defendant cannot avoid a court's jurisdiction over his or her physical person, even when there has been some prior illegality on the part of the government. *See INS v. Lopez-Mendoza*, 468 US 1032, 1039, 104 S Ct 3479, 82 L Ed 2d 778 (1984) ("The 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." (Citation omitted.)).[11] That principle has unavoidable evidentiary consequences for the application of the exclusionary rule: An individual cannot escape a tribunal's power over his or her "body" under a lawful arrest warrant despite being subject to an illegal seizure; in that respect, the person's "identity" is not subject to suppression on a purely practical level. *See Pretzantzin v. Holder*, 736 F3d 641, 650 (2d Cir 2013) (so concluding); *United States v. Garcia-Beltran*, 389 F3d 864, 868 (9th Cir 2004) (same).

However, to acknowledge that officers lawfully may arrest and lawfully search a defendant based on a valid arrest warrant that is discovered during an unlawful detention does not mean that the causal connection between the unlawful detention and evidence discovered in the lawful search incident to arrest can be ignored. Defendant here does not seek to suppress his person or his identity; instead,

---

[11] Federal appellate courts are divided as to whether the quoted statement from *Lopez-Mendoza* simply recognizes an established jurisdictional rule, namely, that an unlawful seizure does not deprive a court of jurisdiction over the arrestee, or, instead, whether the statement establishes a blanket rule that a defendant's identity—and any evidence related to that identity—is never subject to suppression. *Compare United States v. Olivares-Rangel*, 458 F3d 1104, 1106 (10th Cir 2006) (interpreting *Lopez-Mendoza* as merely reiterating long-standing jurisdictional rule), and *United States v. Guevara-Martinez*, 262 F3d 751, 754-55 (8th Cir 2001) (same) *with United States v. Bowley*, 435 F3d 426, 430-31 (3d Cir 2006) (interpreting *Lopez-Mendoza* as barring suppression of evidence of identity), and *United States v. Navarro-Diaz*, 420 F3d 581, 588 (6th Cir 2005) (same). However, that split in authority is not relevant to the point we make here.

he challenges the admission of physical evidence that was the object of an unlawful seizure. As the Kansas Supreme Court recently explained, the difference matters:

> "[T]he preceding unlawful detention does not taint the lawful arrest on the outstanding warrant, nor does it prevent the officer from conducting a safety search pursuant to that arrest; but it does taint any evidence discovered during the unlawful detention or during a search incident to the lawful arrest.

> "Were it otherwise, law enforcement officers could randomly stop and detain citizens, request identification, and run warrants checks despite the lack of any reasonable suspicion to support the detention, knowing that if the detention leads to discovery of an outstanding arrest warrant, any evidence discovered in the subsequent search will be admissible against the defendant in a criminal proceeding unrelated to the lawful arrest."

*State v. Moralez*, 297 Kan 397, 415, 300 P3d 1090, 1102 (2013);[12] *see also State v. Hummons*, 227 Ariz 78, 81, 253 P3d 275, 278 (2011) ("[T]he subsequent discovery of a warrant is of minimal importance in attenuating the taint from an illegal detention upon evidence discovered during a search incident to an arrest on the warrant.").

Thus, a synthesis emerges. Where a person's identity is made known to the police during an unlawful detention, and he or she is determined to be the subject of a valid

---

[12] Determining the deterrence value of suppression where evidence of a crime is found during a search incident to an arrest based on a valid warrant discovered during an unlawful detention may be somewhat more complicated than the quoted statement suggests. For example, the particular purpose of an unlawful detention might not have been to acquire evidence of a crime but, rather, to discover a valid arrest warrant so that a person of interest could be lawfully arrested and detained. In that circumstance, the suppression of evidence of a crime found in a search incident to arrest based on the warrant might not as strongly implicate the deterrence rationale of the exclusionary rule. However, that possibility does not justify failing to apply the rule. Not only is the subjective purpose of an unlawful detention often difficult to ascertain—indeed, the police may have multiple motives for impermissibly detaining a person of interest—but the deterrence value of suppressing incriminating evidence is not entirely vitiated where the particular motive for the detention was not to secure the evidence. By excluding evidence in such circumstances, some deterrence value is attained, even if it is not as great as where obtaining the evidence was a particular objective of the unlawful detention, because applying the rule admonishes the police to operate within the bounds of the law.

arrest warrant, the police may lawfully arrest the person and conduct a lawful search incident to the arrest. However, the *Brown* framework nevertheless applies to the separate determination whether the causal connection between the unlawful detention and the discovery of evidence in the search incident to arrest has been sufficiently attenuated so as to dissipate the taint of the illegality.

In light of *Brown*, it is therefore apparent that this court's decision in *Dempster* does not accurately reflect the current state of the law. As we stated in *Mowry*,

> "this court's obligation when interpreting constitutional and statutory provisions and when formulating the common law is to reach what we determine to be the correct result in each case. *** [T]his court is willing to reconsider cases when the legal or factual context has changed in such a way as to seriously undermine the reasoning or result of earlier cases."

*Mowry*, 350 Or at 698. Without engaging in a detailed analysis, this court in *Dempster* adopted a *per se* rule for determining the effect, for attenuation purposes under the Fourth Amendment, of the discovery and execution of a lawful arrest warrant on preceding unlawful police conduct. By adopting a multi-factor test for determining whether the effect of unlawful police conduct has been sufficiently attenuated to permit the admission of challenged evidence, the Supreme Court in *Brown* undermined this court's reasoning in *Dempster*. Accordingly, we disavow our holding in *Dempster* and conclude, instead, that the *Brown* factors supply the correct standard for the Fourth Amendment analysis in this case.[13]

---

[13] We note that, in *State v. Unger*, 356 Or 59, 333 P3d 1009 (2014), this court applied factors similar to the *Brown* factors in conducting an attenuation analysis under Article I, section 9, of the Oregon Constitution, in the context of a consent search that was preceded by unlawful police conduct. In rejecting a *per se* test similar to the one adopted in *Dempster*, the court stated:

> "A *per se* rule—either the rule advocated by the state, that voluntary consent (almost always) trumps prior unlawful police conduct, or its opposite, that unlawful police conduct (almost always) trumps later voluntary consent— fails to account for the myriad variety of circumstances in police-citizen interactions."

*Id.* at 84-85.

We now apply those factors to the evidentiary record in this case. The first factor is the amount of time that elapsed between the unlawful police conduct and the discovery of the challenged evidence. *Brown*, 422 US at 603. Generally speaking, that factor is most pertinent where the intervening circumstance involves a volitional act by the defendant, such as a confession or consent to a search. *See, e.g.*, *Simpson*, 439 F3d at 495; *Green*, 111 F3d at 522; *see also United States v. Najjar*, 300 F3d 466, 486 n 2 (4th Cir 2002) ("[T]he temporal factor in *Brown* served as evidence of the exercise of free will on the part of the accused in giving a confession subsequent to an illegal arrest."). However, it also carries weight in other circumstances as well. Here, for example, the relevant police conduct consisted of an unlawful detention that persisted until shortly before the discovery of challenged evidence. In such circumstances, there is less likely to be a sufficient break in the causal chain between the unlawful police conduct and the discovery of evidence so as to attenuate the taint of the illegality. Where, in contrast, incriminating evidence—such as a jailhouse confession made several days later—is secured long after the preceding illegality ended, the causal connection between the two may be much weaker. In short, because the temporal break between the unlawful detention and the discovery of the evidence was brief, that factor bears some weight in favor of suppression. *See, e.g.*, *Mazuca*, 375 SW3d at 306 ("In our view, the first *Brown* factor is certainly relevant, but, even though it usually favors suppression of evidence that is discovered in the immediate aftermath of an illegal pedestrian or roadside stop, it will sometimes prove to be, in the context of the seizure of physical evidence, 'the least important factor'—at least relative to the other two.").

The second factor is the existence of intervening circumstances. *Brown*, 422 US at 603. In this case, the posited intervening circumstance was the discovery of the warrant for defendant's arrest. As discussed, the warrant provided a lawful basis for defendant's arrest and the subsequent search incident to arrest. However, it is difficult to weigh the significance of the discovery of the arrest warrant in the attenuation analysis without considering the officers' unlawful detention of defendant. That is, the weight

assigned to the discovery of the arrest warrant depends on the degree to which it was the direct consequence or objective of the unlawful detention. Where, as here, the discovery of the arrest warrant was an objective of the unlawful detention, "it should not be overemphasized to the ultimate detriment to the goal of deterrence that animates the exclusionary rule." *Mazuca*, 375 SW3d at 306.

The third factor is the purpose and flagrancy of the unlawful police conduct. *Id.* at 604. In light of the more limited relevance of the other two factors, it is apparent that, in this case, the greatest weight should be placed on that factor. That conclusion is consistent with the exclusionary rule's deterrence-based justification and with recent United States Supreme Court decisions applying the exclusionary rule. *See Davis v. United States*, __ US __, 131 S Ct 2419, 2427, 180 L Ed 2d 285 (2011) ("[T]he deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue. When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." (Citations omitted.)).

The focus of the purpose and flagrancy factor is on whether the stop was investigatory in nature and whether the unlawfulness of the police conduct should have been obvious to the officers. *Brown*, 422 US at 605. In *Brown*, the Supreme Court noted that the arresting officers had "virtually conceded" that the arrest obviously had been unlawful when they repeatedly acknowledged that the purpose of the arrest "was 'for investigation' or for 'questioning.'" *Id.* Further, the Court held that the arrest had been investigatory "both in its design and in execution" because the officers had "embarked upon this expedition for evidence in the hope that something might turn up." *Id.*

This case presents analogous circumstances. The initial traffic stop was lawful, but the purpose of enforcing the traffic laws was merely incidental to an overarching investigatory purpose. The officers specifically targeted defendant and his fellow passengers. An officer who was monitoring the car through aircraft surveillance asked

ground officers to pull it over even before anyone observed a traffic violation. Although the ground officers waited until they observed a traffic violation before initiating the stop, their intent remained investigatory.

The unlawful detention also was flagrant. The circuit court ruled that the traffic stop should have lasted about five minutes, but it ultimately lasted about 37 minutes. Thus, the officers unlawfully extended the stop of the occupants of the vehicle, including defendant, by more than 30 minutes, or 600 percent.

The state contends that, although the stop was unlawfully extended, it was extended not to investigate defendant but to verify the driver's insurance coverage. That argument is unavailing here. Under the Fourth Amendment, for the duration of a traffic stop, a police officer effectively seizes "everyone in the vehicle," the driver and all passengers. *Arizona v. Johnson*, 555 US 323, 327, 129 S Ct 781, 172 L Ed 2d 694 (2009); *Brendlin v. California*, 551 US 249, 255, 127 S Ct 2400, 168 L Ed 2d 132 (2007). An officer may ask passengers questions during a traffic stop that are unrelated to a lawful purpose for the stop, but only if the inquiry does not measurably extend the stop. *Johnson*, 555 US at 333. The circuit court here expressly found that the overall stop of the vehicle and its occupants should have lasted no more than five minutes because, within that time period, the officers had completed their investigation of the traffic infraction and determined that the driver was not carrying proof of valid insurance. The state has not challenged that finding, and it binds us on review.[14]

Throughout the period of unlawful detention, the officers repeatedly asked defendant for his identification. When defendant refused, Stradley called another officer, Burley, to the scene to identify him. When Burley was delayed, Stradley sat in his patrol car running records searches, hoping that he could remember defendant's name.

---

[14] The state does not contend that, in response to the officers' inquiry, defendant was required to identify himself or that defendant's refusal to identify himself provided an independent justification for the extension of the stop. *Cf. Hiibel*, 542 US at 188 ("[A]n officer may not arrest a suspect for failure to identify himself if the request for identification is not reasonably related to the circumstances justifying the stop.").

Stradley testified that it would have been against his interest to tell defendant that defendant was free to leave the scene because, according to Stradley, "I want[ed] to have them identified." After Burley arrived and identified defendant, Stradley immediately ran the warrant check on defendant.

To put a finer point on things, the officers in this case detained defendant for an investigatory purpose without reasonable suspicion that he had engaged in unlawful activity for more than 30 minutes after the lawful justification for the traffic stop had ended. That conduct was purposeful, and it should have been obvious to the officers that they had extended the detention without regard to defendant's right to be free from an unreasonable seizure. *See Moralez*, 300 P3d at 1103 ("Regardless of whether a suspicionless detention to identify a citizen and check that citizen for outstanding arrest warrants is characterized as a standard practice, a field interview, a pedestrian check, or a 'fishing expedition,' such a detention can, and often will, demonstrate at least some level of flagrant police conduct.").[15]

For purposes of the federal exclusionary rule, the effect of that factor, when considered along with the temporal proximity between the unlawful detention and the discovery of the challenged evidence, outweighs any value that otherwise might be assigned to the subsequent discovery of a valid arrest warrant. *See Hummons*, 253 P3d at 278 ("If the purpose of an illegal stop or seizure is to discover a warrant—in essence, to discover an intervening circumstance—the fact that a warrant is actually discovered cannot validate admission of the evidence that is the fruit of the illegality."). Because the state failed to meet its burden to establish attenuation, the circuit court erred by denying defendant's motion to suppress. We therefore reverse the decision of the Court of Appeals affirming the circuit court's denial of that motion.

---

[15] *Cf. Stufflebeam v. Harris*, 521 F3d 884, 889 (8th Cir 2008) ("[Where police] prolong[ed] the detention and then arrest[ed] *** a passenger not suspected of criminal activity, because he adamantly refused to comply with an unlawful demand that he identify himself[,] *** no reasonable police officer could believe he had probable cause to arrest this stubborn and irritating, but law abiding citizen.").

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.