Submitted January 27, reversed and remanded August 19, 2015

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## WILLIAM LOUIS MITCHELL,
*Defendant-Appellant.*

Multnomah County Circuit Court
130230532; A154686

360 P3d 525

Peter Gartlan, Chief Defender, and Laura E. Coffin, Deputy Public Defender, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Pamela J. Walsh, Senior Assistant Attorney General, filed the brief for respondent.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

TOOKEY, J.

## TOOKEY, J.

Defendant was charged with possession of methamphetamine, ORS 475.894, and he moved to suppress the evidence of methamphetamine, arguing that he was unlawfully seized and that the discovery of an outstanding warrant did not purge the taint of the illegality. The trial court determined that defendant was unlawfully seized but denied defendant's motion to suppress, concluding, under the Fourth Amendment to the United States Constitution,[1] that the causal connection between the unlawful seizure and the challenged evidence was sufficiently attenuated by the discovery of the outstanding warrant so as to purge the taint of the illegality. The trial court then conducted a bench trial without obtaining a written jury waiver from defendant and convicted defendant as charged.

Defendant now appeals the resulting judgment of conviction. In his first assignment of error, defendant argues that the trial court improperly denied his motion to suppress, contending that the court incorrectly concluded that the discovery of the outstanding warrant purged the taint of the unlawful seizure. In his second assignment of error, defendant argues that the trial court plainly erred by conducting a bench trial without obtaining a written jury waiver from defendant.

As to the first assignment of error, we assume without deciding that defendant was unlawfully seized, agree with the trial court that the causal connection between the unlawful police conduct and the challenged evidence was sufficiently attenuated by the discovery of the outstanding warrant so as to purge the taint of the illegality, and conclude that the trial court did not err in denying defendant's motion to suppress. As to the second assignment of error, the state concedes that the trial court plainly erred when it conducted a bench trial without obtaining a written jury waiver from defendant, and we agree and accept the state's concession. Accordingly, we reverse and remand.

---

[1] The Fourth Amendment provides, in part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"

We are bound by the trial court's findings of fact as long as there is constitutionally sufficient evidence to support them. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). In the absence of express factual findings, we presume that the trial court decided the disputed facts in keeping with its ultimate conclusion. *Id.* at 75. On appeal, "[o]ur function is to decide whether the trial court applied legal principles correctly to those facts." *Id.* We state the facts consistently with those standards.

Boltjes was a fare inspector for TriMet, which operates a mass transit system in Portland. As a fare inspector, Boltjes had the authority, on or within TriMet property, to check a person for a fare and to "detain[] that person for enough time to identify them and write them a citation * * * for fares and other TriMet code violations." Boltjes was not authorized to make an arrest.

Bowen was a police officer assigned to the Transit Police Division. Bowen was periodically assigned to assist fare inspectors and enforce fare violations, and he often "assist[ed] the fare inspectors with identifying people when they [did not] have ID on them." Bowen would identify people by "ask[ing] the person for their name, the date of birth, some clarifying information." Typically, he would "ask them for their date of birth and how old they are" to "[m]ake sure those match." He would also "[a]sk them if they've ever been arrested before, if they're currently on probation, [and] if they have an Oregon driver's license." Then Bowen would "double-check" that information to make sure that it matched what the person had reported.

While conducting a fare inspection mission one night, Boltjes saw defendant at the Rose Garden Transit Center. Believing that defendant had ridden a train, Boltjes approached defendant and "asked him for his fare."[2]

---

[2] The record does not reveal where defendant was when Boltjes approached him; Boltjes did not remember whether he approached defendant while defendant was seated on the train or while defendant was exiting the train. Defendant testified that he had briefly stepped onto a train to look for his girlfriend and then stepped back onto the platform when he discovered that his girlfriend was not on the train. Boltjes testified that defendant had ridden the train and that there was no possibility that defendant was attempting to enter the train. The trial court found that Boltjes believed that defendant had ridden the train and that Boltjes's belief was objectively reasonable.

Defendant did not have a fare. Boltjes then asked defendant for his identification. Defendant said that he did not have any identification, and he verbally provided Boltjes with a name and a date of birth. Boltjes wrote down that identifying information, but he did not think that it was correct, because, based on the date of birth that defendant had provided, defendant would have been about 40 years old, and defendant did not appear to be 40 years old.

Bowen was on duty at the transit center on the night in question. Boltjes escorted defendant to Bowen's patrol vehicle and told Bowen that he did not believe that defendant was being honest about his identity. Boltjes then relayed defendant's identifying information to Bowen and asked him to check it "through his channels." Boltjes could not "say for sure" whether his contact with defendant ended at that point, but generally, when it gets to that point, Boltjes lets the officer "take over." Boltjes did not issue defendant a citation for riding the train without a fare.

Bowen asked defendant for his name and date of birth. When defendant verbally provided Bowen with the same identifying information that defendant had provided to Boltjes, Bowen "was suspicious, given that [defendant] appeared to be older than 40." Nevertheless, Bowen "ran that information over the radio" while defendant and Boltjes stood at the hood of Bowen's patrol vehicle.

Bowen located a photograph of the person matching the identifying information that defendant had provided to Boltjes and Bowen. Bowen observed that the photograph appeared to be of a person who was younger than defendant, and Bowen's suspicion increased. Bowen then "started to look for other identifying characteristics, tattoos, other stuff that's harder to change frequently on a person" and found that the "tattoos and the physical descriptors also did not match with [defendant's]."

Bowen told defendant that he did not think that he was being honest and gave him "one last option to be honest." Specifically, Bowen told defendant that if he did not disclose his actual name and date of birth, Bowen was going to charge him with giving false information to a police officer.

At that point, defendant disclosed to Bowen his actual name and date of birth.

Bowen then "confronted [defendant] with his lie and began asking him why he lied," and defendant "said he thought he had a warrant." Bowen then tried "to verify that name" and, in the process of doing so, Bowen located an outstanding warrant for defendant's arrest. Bowen had the warrant confirmed and arrested defendant. When defendant was searched incident to the arrest, the police discovered a crystalline substance that later tested positive for methamphetamine.

In his motion to suppress, defendant argued that he was unlawfully seized when Bowen ran a records check on him and that, under federal law, "the subsequent discovery of a valid warrant [did] not 'purge the taint' of the unlawful 'stop' of defendant." At a hearing on the matter, the state responded that defendant was not seized and alternatively argued that, even if defendant was seized, suppression was not warranted because the discovery of the outstanding warrant was "an attenuating circumstance." To support its attenuation argument, the state pointed to *State v. Dempster*, 248 Or 404, 408, 434 P2d 746 (1967), in which the Oregon Supreme Court, relying on Fourth Amendment case law, concluded that the lawful arrest of the defendant on a bench warrant "purged the search incident thereto of the taint of any illegality in the detention of defendant prior to that time." The state urged the trial court to apply *Dempster* in the trial court's Fourth Amendment analysis in this case.

Regarding the seizure issue, the trial court stated:

"The question is whether at some point during the encounter the lawful authority to detain [defendant] for purposes of verifying his identification for purposes of writing a citation ended and turned into unlawful authority, or unlawful exercise of authority, detaining [defendant] without reasonable suspicion or probable cause. And the testimony was unclear as to how long it took.

"But certainly, the investigation changed from one of an investigation into the defendant's identity for purposes of writing him a citation, into an investigation to determine whether or not there was an outstanding warrant for his arrest.

"* * * * *

"Once Bowen confronted [defendant] with his lie and began asking him why he lied, that was a new investigation and at that point, there was no basis for * * * suspicion or probable cause for Bowen to detain [defendant] for that, for the purpose of that new investigation.

"So I do believe under the facts and I conclude under the facts of this case as presented that the—although I don't believe the initial stop and detention by Boltjes was unlawful, I do believe that the investigation changed at some point during the encounter to a new investigation, and that Bowen then was exercising his authority to stop and detain [defendant], and * * * Bowen did not have lawful authority to do so, didn't have reasonable suspicion or probable cause at that point to do so. So the stop itself was unlawful."

Having determined that defendant was unlawfully seized "[o]nce Bowen confronted [defendant] with his lie and began asking him why he lied," the court then discussed the legal basis for defendant's motion to suppress:

"[COURT]:   That leads us to the second question, which I understand the defense concedes that under Oregon law the subsequent discovery of an arrest warrant purges the taint of the unlawful stop. So the arrest and subsequent search under the arrest warrant, under Oregon law, would be permissible.

"Defense's argument, as I understand it, is whether or not the arrest pursuant to the warrant, and then search incident to that arrest is permissible under federal law. That's what I understand where we're at now, so I'll hear your argument on that.

"[DEFENSE COUNSEL]: Yes, Your Honor, that is correct."

The court then noted that there was "a split of the circuits on this issue" and described its task as attempting "to predict how the United States Supreme Court would rule on this issue of federal constitutional law."

When considering the parties' attenuation arguments under the Fourth Amendment, the court declined to apply *Dempster*'s *per se* attenuation rule. Instead, the court examined the particular facts of the case, focusing on three

factors: the length of time between the unlawful seizure and the discovery of the warrant, the presence of intervening circumstances, and the purpose and flagrancy of the unlawful police conduct. The court determined that the first factor weighed in favor of suppression and that the second factor bore some weight in favor of suppression. The court then determined that the third factor—the purpose and flagrancy of the unlawful police conduct—"weigh[ed] in favor of the state" due to "the lack of any flagrant or improper purpose on the officer's part." Specifically, the court stated:

> "I don't think that Officer Bowen consciously intended to violate anyone's constitutional rights, or even unconsciously intended to violate anyone's constitutional rights.

> "* * * [I]t's very arguable whether his stop was unlawful. I've concluded that it was because he strayed into a new investigation. But it was certainly understandable why he would do that given the fact that he was confronted with an individual who had given a false name, who then admitted that he had given a false name and who then admitted that the reason he had given a false name was he was fearful that he had a warrant for his arrest.

> "It's certainly reasonable under those circumstances for the officer to find out whether in fact there was a warrant for his arrest. When he discovered there was one he was obligated, I believe, to arrest [defendant] on that warrant."

In its attenuation analysis, the court described the unlawful seizure as a "technical violation" and a "technically unlawful stop"; concluded that "the discovery of the arrest warrant under the particular circumstances of this case was not the fruit of the poisonous tree from the unlawful stop"; and denied defendant's motion to suppress.

On appeal, defendant contends that the "trial court correctly concluded that defendant was unlawfully stopped when a police officer ordered him to disclose his identity, but it incorrectly concluded that the discovery of an arrest warrant purged the taint of the unlawful stop." As to the Fourth Amendment attenuation analysis, defendant agrees with the trial court's analysis of the first two factors but argues that, contrary to the trial court's ruling, "the third factor—purpose and flagrancy of police conduct—cuts in

favor of defendant" because "Bowen illegally obtained defendant's identity for the purpose of checking for warrants." In addition, defendant contends that the evidence must be suppressed under Article I, section 9, of the Oregon Constitution.

In response, the state "assumes, without conceding, that the trial court correctly determined that the officer unlawfully stopped defendant." It argues that the trial court correctly determined the attenuation issue under the Fourth Amendment, "[g]iven the findings of the trial court" that the "officer detained defendant for a short time to ascertain defendant's identity, that the officer detained defendant to look for a warrant after defendant told the officer that he might have a warrant, and that the officer's conduct did not result from an improper purpose and was not at all flagrant." The state also argues that defendant failed to preserve any argument that the evidence must be suppressed under Article I, section 9, because "[d]efendant assured the trial court that he was making no argument under Oregon law."

We pause to clarify that, for purposes of this opinion, we need not decide whether defendant was unlawfully seized. Instead, finding the attenuation issue dispositive, we assume without deciding that defendant was unlawfully seized when Bowen "confronted [defendant] with his lie and began asking him why he lied," and we proceed to consider whether the causal connection between the unlawful police conduct and the challenged evidence was sufficiently attenuated so as to purge the taint of the illegality. Further, we agree with the state that defendant failed to preserve any argument that the evidence must be suppressed under Article I, section 9. That is so because, at the suppression hearing, defendant expressly agreed that he had "concede[d] that under Oregon law the subsequent discovery of an arrest warrant purge[d] the taint of the unlawful stop," and he agreed that "the arrest and subsequent search under the arrest warrant, under Oregon law, would be permissible." Based on defendant's concessions, the trial court described its task as attempting "to predict how the United States Supreme Court would rule on this issue of federal constitutional law." Because the trial court ruled solely under federal law, we decline to consider defendant's

Article I, section 9, argument on appeal and conduct only a Fourth Amendment attenuation analysis.[3]

Our Fourth Amendment attenuation analysis is governed by *State v. Bailey*, 356 Or 486, 338 P3d 702 (2014). In *Bailey*, the Oregon Supreme Court disavowed its holding in *Dempster* and applied a three-factor test to determine, under the Fourth Amendment, whether the causal connection between the unlawful seizure of the defendant and the subsequent discovery of evidence was sufficiently attenuated by the intervening discovery of an outstanding warrant so as to purge the taint of the illegality. Those three factors, which were adopted from *Brown v. Illinois*, 422 US 590, 95 S Ct 2254, 45 L Ed 2d 416 (1975), are the same factors that the trial court applied in this case: (1) the temporal proximity between the unlawful police conduct and the discovery of the challenged evidence; (2) the presence of intervening

---

[3] Our conclusion that defendant failed to preserve the attenuation issue under Oregon law implicates an unresolved conflict between our "first things first" doctrine and preservation requirements. On the one hand, the "first things first" doctrine obliges us to address state constitutional law claims before addressing federal law claims. *See State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (stating the rule "that all questions of state law [are to] be considered and disposed of before reaching a claim that this state's law falls short of a standard imposed by the federal constitution on all states"). On the other hand, preservation requirements generally preclude us from reviewing unpreserved claims of error. *See* ORAP 5.45 ("No matter claimed as error will be considered on appeal unless the claimed error was preserved in the lower court * * *, provided that the appellate court may consider an error of law apparent on the face of the record.").

Although we are aware of the unresolved conflict, we do not think that this case is the appropriate vehicle to resolve it. That is so because, as we recently stated in *State v. Velykoretskykh*, 268 Or App 706, 707 n 2, 343 P3d 272 (2015), resolving that conflict "should await either a Supreme Court decision or a situation in which the outcome of the state constitutional claim would be more beneficial to the claimant than the outcome under the federal claim." As we explain below, we conclude, under the Fourth Amendment, that the trial court did not err in denying defendant's motion to suppress because the causal connection between the unlawful police conduct and the challenged evidence was sufficiently attenuated so as to purge the taint of the illegality. If we were to consider defendant's unpreserved state claim in this case, we would almost certainly reach the same conclusion under Article I, section 9. *See State v. Benning*, 273 Or App 183, 359 P3d 357 (2015) (concluding that the state had failed to prove attenuation under Article I, section 9, after analyzing five considerations, including the temporal proximity between an unlawful seizure and the discovery of challenged evidence, the intervening circumstance of an outstanding warrant, and the purpose of flagrancy of the unlawful police misconduct). Thus, as in *Velykoretskykh*, "a decision whether to address the unpreserved state claim would be irrelevant to the outcome." 268 Or App at 707 n 2.

circumstances; and (3) the purpose and flagrancy of the unlawful police conduct. *Bailey*, 356 Or at 505-06.

In this case, the first *Brown* factor—temporal proximity—weighs in favor of suppression because there was almost no temporal break between the unlawful seizure of defendant and the discovery of the challenged evidence. *See id.* at 505 (determining that, "because the temporal break between the unlawful detention and the discovery of the evidence was brief, that factor bears some weight in favor of suppression"); *see also State v. Clemons*, 267 Or App 695, 701, 341 P3d 810 (2014) (concluding that the first factor weighed in favor of suppression because little or no time had elapsed between the unlawful extension of a traffic stop and the discovery of the evidence at issue).

The second *Brown* factor is the presence of intervening circumstances. *Bailey*, 356 Or at 505. Here, as in *Bailey*, "the posited intervening circumstance was the discovery of the warrant for defendant's arrest[,]" which "provided a lawful basis for defendant's arrest and the subsequent search incident to arrest." *Id.* "[T]he weight assigned to the discovery of the arrest warrant depends on the degree to which it was the direct consequence or objective of the unlawful detention." *Id.* at 505-06. Here, the discovery of the arrest warrant was the direct consequence of the unlawful detention because Bowen would not have discovered the outstanding warrant if defendant had not been unlawfully detained. As to whether the discovery of the arrest warrant was the objective of the unlawful detention, the trial court found that Bowen was detaining defendant "to determine [defendant's] identification and to determine whether or not there was * * * a warrant for his arrest outstanding once the defendant told him that he thought there might be." However, the court also found that Bowen "certainly wasn't randomly just stopping people on the street to find out who might have an arrest warrant." Thus, the second factor bears only some weight in favor of suppression.

The third *Brown* factor is the purpose and flagrancy of the unlawful police conduct. *Id.* at 506. "The focus of the purpose and flagrancy factor is on whether the stop was investigatory in nature and whether the unlawfulness

of the police conduct should have been obvious to the officers." *Id.*

Based on the facts of this case, we conclude that the unlawful seizure of defendant did not constitute purposeful and flagrant misconduct. As to the purposefulness of the unlawful police conduct, the unlawful seizure cannot be described as a fishing expedition to see what might turn up. *See Clemons*, 267 Or App at 702 ("Unlawful police conduct 'has a quality of purposefulness' when officers embark on a fishing expedition 'for evidence in the hope that something might turn up.'" (Quoting *Brown*, 422 US at 605.)). Before defendant was unlawfully seized, Bowen was attempting to ascertain defendant's identity at Boltjes's request, and Bowen had become suspicious that defendant was lying about his identity. Furthermore, Bowen's suspicion increased when he discovered that defendant's appearance did not match the physical description of the person whose name defendant had provided. Thus, as the trial court concluded, "it was certainly understandable why [Bowen] would [stray into a new investigation] given the fact that he was confronted with an individual who had given a false name, who then admitted that he had given a false name and who then admitted that the reason he had given a false name was he was fearful that he had a warrant for his arrest." As to the flagrancy of the unlawful police conduct, it cannot be said that the unlawfulness of the seizure should have been obvious to Bowen, because, as the trial court stated, it is "very arguable whether his stop was unlawful" in this case.

When we balance the *Brown* factors with the facts presented in this case, we conclude that the causal connection between the unlawful police conduct and the challenged evidence was sufficiently attenuated by the discovery of the outstanding warrant so as to purge the taint of the illegality. Accordingly, we conclude that the trial court did not err in denying defendant's motion to suppress.

We now turn to defendant's second assignment of error, in which he argues that the trial court plainly erred by conducting a bench trial without obtaining a written jury waiver from defendant. The state concedes that the trial court plainly erred in that regard, and we agree and accept

the state's concession. *See State v. Barber*, 343 Or 525, 530, 173 P3d 827 (2007) (concluding that "[t]here is no waiver of a jury trial unless that waiver is in writing[,]" and stating that this court had no "discretion to ignore the absence of a written waiver"). Accordingly, we reverse and remand.

Reversed and remanded.